IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN JUDICIAL DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Case No.

**KAREN ADAMS; BILL AND EVELYN BAYSDEN; LEAMON BENSON, JR.; ARTHUR AND GERI BISHOP; JARRETT DOUGLAS BROWN; MARK BULLOCK; LARRY BYERS; DAN AND KATE CHOMKO; DEBORAH AND MICHAEL CLARK; JOSHUA COHEN; ROBERT AND ELEANORA DANIELE; ROGER HALL, JR.; DONALD AND LISA HARTE, JR.; HORACE AND TRUDY HICKS; BRAD AND STEPHANIE HIRSCHY; MICHAEL AND ALLISON HOLBERT; LINWOOD AND JACQUELYN HUMPHREY; LOGAN AND ROBIN HYSMITH; SHERIF ISKANDER; DAVID AND DORIS MAZURKEVICH; MICHAEL AND JOY NEYLAND; MARIANN AND DONALD MILLER; THE O'DELL FAMILY TRUST; THE DAVID O'DELL DEFINED BENEFIT PENSION PLAN; GARY AND JANE O'DELL AS TRUSTEES FOR THE DECLARATION OF TRUST DATED JUNE 6, 1994; SAMUEL AND CRYSTAL PARZOW; CARRIE AND WILLIAM PASSMORE; GARY AND DEBRA PONTENBERG; GENE AND LEE ANN RIDDLE; ROMARLI, LLC; THOMAS AND LORI RUFF; KIMBERLY SMITH; WILLIAM AND DIANE SMITH; JOHN AND MARILYN TEMPLE; DAVID AND JESSICA THIGPEN; SCOTT TYBURSKI; STEVEN WHITED; SCOTT WILLIAMS**

Plaintiffs,

vs.

**EMILY L. ADAMS**, an individual**; MINOK LEE ALLEN**, an individual**; RANDOLPH ALLEN**, an individual**; WILLIAM G. ALLEN**, an individual**; KENNETH BEDNAR**, an individual**; BERTHADALE R. BEST**, an individual**; JOHN BODEN**, an individual**; SCOTT BROGAN**, an individual**; CHARLES RUFFIN POOLE**, an individual**; ALAN SULLIVAN**, an individual; **R. DOUGLAS THERRELL**, an individual; **THE R. DOUGLAS THERRELL FAMILY TRUST**, a North Carolina Family Trust**; JAMES S. WAGONER**, an

individual; **JAMES S. WATSON**, an individual; **RICHARD MACE WATTS**, an individual; **LANNY T. WILSON**, an individual; **MICHAEL WOOLARD**, an individual; **BANK OF AMERICA, N.A.; BRANCH BANKING AND TRUST COMPANY,** a North Carolina corporation; **BRANCH BANKING AND TRUST COMPANY OF SOUTH CAROLINA**, a South Carolina corporation; **CANNONSGATE AT BOGUE SOUND HOMEOWNERS ASSOCIATION, INC.**, a North Carolina corporation; **COOPERATIVE BANK,** a North Carolina corporation; **CRAVEN'S GRANT HOMEOWNERS ASSOCIATION, INC.**, a South Carolina corporation; **FIRST BANK,** a North Carolina corporation**; FIRST-CITIZENS BANK & TRUST COMPANY,** a North Carolina corporation**; FIRST NATIONAL BANK OF THE SOUTH;** a South Carolina corporation; **MARYVILLE PARTNERS, INC.**, a South Carolina corporation; **MLA INCOME PROPERTIES, LLC,** a North Carolina or Nevada limited liability company**; NAFH NATIONAL BANK,** a federally chartered bank; **R.A. NORTH DEVELOPMENT, INC.**, a North Carolina corporation; **R.A. NORTH DEVELOPMENT I, INC.**, a North Carolina corporation; **RBC BANK (USA),** a North Carolina corporation**; SANTA ROSA LAND DEVELOPMENT COMPANY**, a North Carolina limited liability company; **SOUTHEASTERN LAND SALES, INC**. a North Carolina corporation; **SOUTHEASTERN WATERFRONT MARKETING INC.**, a North Carolina corporation; **SUMMERHOUSE ON EVERETT BAY HOMEOWNERS ASSOCIATION, INC.**, a North Carolina corporation; **SUNTRUST BANKS, INC.**, a Georgia Corporation; **WACHOVIA BANK N/K/A WELLS FARGO & COMPANY,** a Delaware corporation**; YADKIN VALLEY BANK AND TRUST COMPANY,** a North Carolina corporation

Defendants.

---

**JOHN S. O'CONNOR**
Attorney for Plaintiffs
THE O'CONNOR LAW FIRM, PLLC
309 S. Laurel Avenue
Suite 100
Charlotte, NC 28207
John@joconnorlaw.com
Phone: 704.919.1885
State Bar No. 37832
LR 83.1 Counsel

**DAVID A. BINKLEY**
**JASON A. SWITZER**
Attorneys for Plaintiffs
GIARMARCO, MULLINS & HORTON, P.C.
Tenth Floor Columbia Center
101 W. Big Beaver Road
Troy, Michigan 48084-5280
Phone: 248.457.7000

---

## COMPLAINT AND JURY DEMAND

---

## I. INTRODUCTION AND EXECUTIVE SUMMARY OF PLAINTIFFS' CLAIMS

1. This is an action for damages arising out of Defendants' common scheme to sell real property to the Plaintiffs at artificially inflated prices, and acting in concert with one another in an elaborate and fraudulent scheme in violation of the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701, et seq. (hereinafter "ILSA"), the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1861, et seq. (hereinafter "RICO"), the North Carolina Unfair and Deceptive Trade Practices Act N.C. GEN. STAT. § 75-1 et seq. (hereinafter "NCUDTPA"), the South Carolina Unfair Trade Practices Act S.C. CODE ANN. § 39-5-10 et seq. (hereinafter "SCUDTPA"), and constituted common law fraud, fraud in the inducement, constructive fraud, breach of fiduciary duty, negligent misrepresentation, violation of the North Carolina Mortgage Lending Act, violation of the South Carolina Licensing Requirements Act, civil conspiracy to commit fraud, and affording Plaintiffs relief under the Declaratory Judgment Act 28 U.S.C. § 2201 *et seq.* (2010).

2. Beginning in mid 2005, the Defendants acted together in various associations in fact to fraudulently induce the Plaintiffs to purchase property at artificially inflated prices, using

high pressure, clearly false sales tactics, rigged appraisals and false promises of early return on investments. The scheme was fueled by the greed of the Defendants, their employees, and a commission arrangement that compensated employees of the Lender Defendants (as defined herein) on the basis of origination and servicing of such loans—not on the quality of the loans. While the scheme was not new, it was clearly fraudulent and in violation of a host of civil and criminal statutes designed to protect consumers such as the Plaintiffs. Each Defendant played an important role in the overall success of the fraud. Throughout this Complaint, Plaintiffs will identify a host of complicit parties beginning with the Lender Defendants, the Developer Defendants (both corporate and individual), the Appraiser Defendants and the Sub-Developer Defendants (both corporate and individual).

3.      The fraud involves the sale of vacant lots in three new developments. Summerhouse on Everett Bay ("Summerhouse") located in Onslow County, North Carolina and Cannonsgate on Bogue Sound ("Cannonsgate") located in Carteret County, North Carolina are both owned and developed by Defendants, R.A. North Development, Inc. and R.A. North Development I, Inc. (hereinafter collectively referred to as "RAN"). The third development is located in Georgetown, South Carolina, known as Craven's Grant on Winyah Bay ("Craven's Grant') and is owned by Maryville Partners, Inc. or its assignee Cravensgrant II, LLC. The three developments will hereinafter collectively be referred to as the "Subdivisions" or the "Property".

4.      Defendants victimized and misled Plaintiffs as to the value of such Property through a scheme implemented by Defendants that infected every step of the real estate purchase process. Specifically, the Defendants' scheme involved, among other things, the introduction of the Properties at lavish "launches" and presales deceptively promoted with standardized marketing materials through the mails and wires; the intentional manipulation of property values

through misrepresentations; fraud; deception; omissions and unconscionable conduct; and the funding of mortgage loans for the Properties, based upon materially false, artificially-inflated and purposefully manipulated appraisals. Defendants developed this scheme and moved this enterprise from one Subdivision to another.

5.     The scheme caused substantial harm to all Plaintiffs. The scheme was designed to and succeeded at building on the inflated values derived from the improper appraisals (which were based on inappropriate comparables), false recording tactics, kickbacks and other improprieties used by Defendants. It was not necessary that every individual sale involved such elements in order for Defendants to obtain prices inflated well beyond where they would have been in the absence of the scheme, as appraisals downstream of the original sales were tainted by the fraud. Moreover, the Defendants knowingly conspired to lie to the Plaintiffs (either in fact or by their acts) about the value of the lots through an elaborate, well-orchestrated scheme.

6.     Each of the Plaintiffs fell victim to the Defendants' scheme and purchased one or more Properties that had a true value far below that represented by Defendants, thereby suffering substantial losses. In fact, the subject properties are actually worth as little as ten percent of their "appraised value," a phenomenon that cannot be explained by a mere "market downturn".

7.     Plaintiffs seek redress for the losses to property, reputation, damaged credit scores and other financial damages that they have suffered as a proximate result of Defendants' illegal acts, and further seek declaratory and injunctive relief to prevent further losses.

## II.  JURISDICTION AND VENUE

8.     This court has jurisdiction pursuant to 18 U.S.C. §§ 1961, 1962 and 1964; 28 U.S.C. § 1331 and 15 U.S.C. § 1701 *et seq.*

9.      This court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

10.     This court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965 (b) and (d).

11.     The activities of the Defendants and their co-conspirators as described herein have been within the flow of interstate commerce on a continuous and uninterrupted basis, beginning as early as 2002 and continuing through the date of this Complaint, and have had a substantial effect on interstate commerce.

12.     Venue is proper pursuant to 28 U.S.C. § 1391 (b) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District.

### III.  PARTIES

**A.      Plaintiffs**

13.     Bill and Evelyn Baysden are residents of Beulaville, North Carolina. They purchased their lots from RAN and received a loan for the purchase of their lots from Branch Banking and Trust Company ("BB&T").  Their purchases of lots 450 and 596 in Summerhouse are described in Exhibit 1.

14.     Leamon Benson, Jr. is a resident of Zebulon, North Carolina. He purchased his lot from RAN and received a loan for the purchase of his lot from BB&T.  His purchase of lot 44 in Cannonsgate is described in Exhibit 2.

15.     Arthur and Geri Bishop are residents of Vienna, Virginia. They purchased their lots from RAN and received a loan for the purchase of their lots from RBC Bank (USA) ("RBC").  Their purchases of lots 985 and 663 in Summerhouse are described in Exhibit 3.

16.     Jarrett Douglas Brown is a resident of Raleigh, North Carolina. He purchased his lot from RAN and received a loan for the purchase of his lot from BB&T.  His purchase of lot 122 in Cannonsgate is described in Exhibit 4.

17.     Mark Bullock and Donald Harte, Jr. and Lisa Harte  are residents of Atlanta, Georgia. They purchased their lots from RAN and received a loan for the purchase of their lots from Wachovia Bank n/k/a Wells Fargo & Company ("Wachovia"). Their purchases of lots 26 and 88 in Summerhouse are described in Exhibit 5.

18.     Larry Byers is a resident of Gainsville, Virginia. He purchased his lot from Total Realty Management, L.L.C. ("TRM") and received a loan for the purchase of his lot from Bank of America, N.A. ("Bank of America"). The purchase of lot 176 in Cannonsgate is described in Exhibit 6.

19.     Dan and Kate Chomko are residents of Napa, California. They purchased their lot from William Allen, Jr. and Jean K. Allen and received a loan for the purchase of their lot from SunTrust Banks, Inc. ("SunTrust"). Their purchase of lot 503 in Cannonsgate is described in Exhibit 7.

20.     Deborah and Michael Clark are residents of Laurel, Maryland. They purchased their lot from Jeffrey and Judith Turner and Charles and Selena Turner, Jr. and received a loan for the purchase of their lot from BB&T.  Their purchase of lot 296 in Summerhouse is described in Exhibit 8.

21.     Joshua Cohen is a resident of Charlotte, North Carolina. He purchased his lot from RAN and received a loan for the purchase of his lot from BB&T. His purchase of lot 173 in Summerhouse is described in Exhibit 9.

22.     Robert and Eleanora Daniele are residents Shelby Township, Michigan. They purchased their lot from RAN and received a loan for the purchase of their lot from Wachovia. Their purchase of lot 846 in Summerhouse is described in Exhibit 10.

23.     Roger Hall, Jr. is a resident of Beulaville, North Carolina. He purchased his lot from RAN and received a loan for the purchase of his lot from BB&T. His purchase of lot 79 in Cannonsgate is described in Exhibit 11.

24.     Horace and Trudy Hicks are residents of Daniel Island, South Carolina. They purchased their lot from RAN and received a loan for the purchase of their lot from Wachovia. Their purchase of lot 445 in Summerhouse is described in Exhibit 12.

25.     Brad and Stephanie Hirschy are residents of Cary, North Carolina. They purchased their lot from John A. Deel and Elaine M. Deel and received a loan for the purchase of their lot from BB&T. Their purchase of lot 367 in Cannonsgate is described in Exhibit 13.

26.     Michael and Allison Holbert are residents Chantilly, Virginia. They purchased their lot from TRM and received a loan for the purchase of their lot from Cooperative Bank for Savings, Inc. n/k/a First Bank ("Cooperative"). Their purchase of lot 488 in Summerhouse is described in Exhibit 14.

27.     Linwood and Jaquelyn Humphrey are residents of Beulaville, North Carolina. They purchased their lot from RAN and received a loan for the purchase of their lot from BB&T. Their purchase of lot 72 in Cannonsgate is described in Exhibit 15.

28.     Logan and Robin Hysmith are residents of Manassas, Virginia. They purchased their lot from PRM and received a loan for the purchase of their lot from First National Bank of the South n/k/a NAFH National Bank. Their purchase of lot 567 in Summerhouse is described in Exhibit 16.

29.     Sherif Iskander is a resident of Goldsboro, North Carolina. He purchased his lot from RAN and received a loan for the purchase of his lot from First Citizens Bank. His purchase of lot 105 in Cannonsgate is described in Exhibit 17.

30.     David and Doris Mazurkevich are residents of Severna Park, Maryland. They purchased their lot from Maryville Partners, Inc. ("Maryville") and received a loan for the purchase of their lot from Wachovia. Their purchase of lot 111 in Craven's Grant is described in Exhibit 18.

31.     Mariann and Donald Miller are residents of Olney, Maryland. They purchased their lot from RAN and received a loan for the purchase of their lot from BB&T. Their purchase of lot 234 in Summerhouse is described in Exhibit 19.

32.     The O'Dell Family Trust purchased its lots from RAN and received a loan for the purchase of its lots from BB&T. The purchase of lots 342 in Cannonsgate and Lot 711 in Summerhouse is described in Exhibit 20.

33.     Michael and Joy Neyland are residents of Virginia.  They purchased their lot from John Bennett and others and received a loan for the purchase of their lot from BB&T.  Their purchase of lot 347 in Cannonsgate is described in Exhibit 20A.

34.     The David O'Dell Defined Benefit Pension Plan purchased its lot from RAN, but later quitclaimed its lot to Entrust Arizona LLC fbo David A. O'Dell IRA 17-14241. The purchase of lot 268 in Cannonsgate is described in Exhibit 21.

35.     Gary and Jane O'Dell are the trustees under a Declaration of Trust dated June 6, 1994 and are residents of Granite Bay, California. They purchased their lot from RAN and received a loan for the purchase of their lot from BB&T. Their purchase of lot 610 in Summerhouse is described in Exhibit 22.

36.     Carrie and William Passmore are residents of Dayton, Maryland. They purchased their lot from RAN and received a loan for the purchase of their lot from Bank of America. Their purchase of lot 175 in Summerhouse is described in Exhibit 23.

37.     Gary and Debra Pontenberg are residents of Cedar Point, North Carolina. They purchased their lot from RAN and received a loan for the purchase of their lot from BB&T. Their purchase of lot 16 in Summerhouse is described in Exhibit 24.

38.     Gene and Lee Ann Riddle are residents of Goldsboro, North Carolina. They purchased their lot from Sherif Iskander, who initially purchased from RAN. Their purchase of lot 70 in Cannonsgate is described in Exhibit 25.

39.     Romarli, LLC is a North Carolina limited liability company. It purchased its lot from RAN and received a loan for the purchase of its lot from Wachovia. Its purchase of lot 169 in Cannonsgate is described in Exhibit 26.

40.     Thomas and Lori Ruff are residents of Crownsville, Maryland. They purchased their lot from RAN and received a loan for the purchase of their lot from Wachovia. Their purchase of lot 236 in Cannonsgate is described in Exhibit 27.

41.     Kimberly Smith and Karen Adams are residents of Goldsboro, North Carolina. They purchased their lot from RAN and received a loan for the purchase of their lot from BB&T. Their purchase of lot 69 in Cannonsgate is described in Exhibit 28

42.     William and Diane Smith are residents of Goldsboro, North Carolina. They purchased their lot from RAN and received a loan for the purchase of their lot from Wachovia, which was later refinanced by Yadkin Valley Bank and Trust Company.  Their purchase of lot 237 in Cannonsgate is described in Exhibit 29.

43.     Scott Tyburski is a resident of Annapolis, Maryland. He purchased his lot from RAN and received a loan for the purchase of his lot from BB&T. His purchase of lot 189 in Cannonsgate is described in Exhibit 30.

44.     Steven Whited and Scott Williams are residents of North Topsail Beach, North Carolina. They purchased their lots from RAN and received a loan for the purchase of their lots from BB&T. Their purchase of lots 68 and 109 in Cannonsgate is described in Exhibit 31.

45.     John Temple and Marilyn Temple are a married couple and are residents of Montgomery, Texas. They purchased their lot from RAN and received a loan for the purchase of his lot from BB&T. The purchase of lot 289 in Summerhouse is described in Exhibit 32.

46.     David and Jessica Thigpen are residents of Raleigh, North Carolina. They purchased their lot from RAN and received a loan for the purchase of their lot from Bank of America, N.A. Their purchase of lot 90 in Summerhouse is described in Exhibit 33.

**B.     Defendants**

**1)     The Allen Related Entities**

47.     For purposes of this Complaint, the "Allen Related Entities" and the "Allen Entities" are used interchangeably and describe those persons or entities associated together for the common purpose of engaging in a course of conduct intended to defraud the Plaintiffs herein. For purpose of the RICO claims set forth herein, however, the Plaintiffs allege that the "Allen Enterprise" is a legally identifiable group or association in fact participating in the fraudulent practices described herein.

48.     All of the following Defendants are Allen Related Entities and, together, comprise the Allen Enterprise:

49.     R.A. North Development, Inc. and R.A. North Development I, Inc., ("RAN") are North Carolina corporations with their principal place of business in North Carolina.  RAN was the original title holder, prior to the acts complained of herein, to the real property located in Carteret County, North Carolina which became known as Cannonsgate and in Onslow County, North Carolina which became known as Summerhouse.

50.     Southeastern Waterfront Marketing ("Southeastern") is a North Carolina corporation with its principal place of business in North Carolina. Southeastern is run at the behest of Randolph Allen ("Randy Allen") and does the bidding of individual Defendants Randy Allen and William G. Allen ("Gary Allen"), through Southeastern's spokespersons, Defendants Kenneth Bednar ("Bednar"), Michael Woolard ("Woolard") and Richard Mace Watts ("Watts"), for the unlawful purposes described herein.

51.     Southeastern Land Sales, LLC ("SLS") is the marketing subsidiary of the Allen Entities responsible for the sales and marketing in Craven's Grant.

52.     Cannonsgate Investments, LLC is a North Carolina limited liability company and is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

53.     The Santa Rosa Land Development Co. ("Santa Rosa") is a business organization owned and operated by Kenneth Bednar.  Upon information and belief, Santa Rosa is simply the alter ego of Kenneth Bednar and is a sham for the purpose of attempting to insulate Bednar from potential liability by raising a corporate shield in defense of actions that are actually the acts of Bednar himself.   Bednar and/or Santa Rosa are responsible for the straw man transaction(s) regarding the purchase of Lot 520 on December 8, 2005 in Cannonsgate, Phase II.

54.     MLA Income Properties, LLC ("MLA") is a North Carolina limited liability company owned and operated by Minok Lee Allen, Defendant Gary Allen's wife.  MLA was

-12-

also formed as an LLC in the State of Nevada. Upon information and belief, MLA operates only in the manner organized under the laws of North Carolina. MLA is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

55.     Maryville Partners, LLC ("Maryville") purports to be a South Carolina corporation doing business in North and South Carolina. Maryville is the original title holder to the real property located in Georgetown County, South Carolina which became known as Craven's Grant. Maryville is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

### 2)     Individual Defendants

56.     Randy Allen is the owner and operator of RAN and RAN I and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Randy Allen is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

57.     Gary Allen was the owner and operator of Southeastern and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Gary Allen is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

58.     Minok Lee Allen ("Mrs. Allen") is the owner and operator of MLA and is Gary Allen's wife. Mrs. Allen uses MLA to hide and conceal assets belonging to the other Allen Related Entities through a series of fraudulent transfers of money and property from RAN to herself.  In addition, Mrs. Allen is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

59.     Woolard was a managing member or a member of Southeastern and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Woolard is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Woolard was also directly involved

in one or more "flip" transactions as well as facilitating the overall scheme in furtherance of the unlawful enterprise. In addition, Woolard contacted the Lender Defendants instructing them as to the price to place on the appraisals well in advance of any alleged underwriting or even before a purchaser was identified.

60.     Bednar was a managing member or a member of Southeastern and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Bednar is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Bednar was also directly involved in one or more "flip" transactions and actively, deliberately and purposefully engaged in fraudulent conduct, in conjunction with other Defendants. In addition, Bednar had supervisory control over the day-to-day operations of Southeastern and approved the actions of his subordinates including those actions constituting many of the predicate acts under RICO. Among other things, Bednar was responsible in whole or in part for the content of the marketing materials used in the furtherance of the overt acts of fraud complained of herein. Additionally, he and/or Santa Rosa are responsible for the straw man transaction(s) regarding the purchase of Lot 520 on December 8, 2005 in Cannonsgate, Phase II.

61.     R. Douglas Therrell ("Therrell") is an individual who has a 30-year relationship with Gary Allen. He and/or the R. Douglas Therrell Family Limited Partnership are responsible for the straw man transaction(s) regarding the purchase of Lot 522 on December 8, 2005 in Cannonsgate, Phase II.

62.     Watts was a managing member or a member of Southeastern and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Watts is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Watts was also directly involved in one or more "flip" transactions as well as facilitating the overall scheme in furtherance of the

unlawful enterprise. In addition, Watts contacted the Lender Defendants instructing them as to the price to place on the appraisals well in advance of any alleged underwriting or even before a purchaser was identified.

63.     Lanny T. Wilson ("Wilson") is a Wilmington based investor and acted as a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Wilson was primarily responsible for the origination of investor funds for the acquisition and development of Summerhouse and Cannonsgate and acted as a liaison to governmental officials for the approval of Department of Environment and Natural Resources permits. (See paragraphs 132 - 146 *supra*) Wilson was actively involved and participated in the fraudulent scheme described herein.

64.     Charles Ruffin Poole ("Poole") is a resident of North Carolina and was previously the assistant to former North Carolina Governor Michael Easley. On or about April 19, 2010, Poole pled guilty to Count 55 of the Superseding Indictment in the *United States of America vs. Charles Ruffin Poole*, USDC for the Eastern District of North Carolina, Western Division, Case No. 5:10-CR-21-1BO(3) in which Poole acknowledged receiving profits from his investment in the scheme. As a part of the scheme, Poole was primarily responsible for arranging and for expediting governmental approval from the Department of Environment and Natural Resources. (See paragraphs 132-146 *supra*)   Poole was also an investor in both Summerhouse and Cannonsgate and was actively involved and participated in the fraudulent scheme described herein.

65.     John Boden ("Boden") was the owner and operator of Coastal Realty Group, LLC and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Boden is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

66.     Scott Brogan ("Brogan") was the managing member of Premier Realty Management, LLC and was directly involved in the operation of the scheme to defraud the Plaintiffs herein. Brogan is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

### 3)     Lender Defendants

67.     Bank of America, N.A. is a nationally chartered bank with its principal place of business in North Carolina and has banking locations is New York, Virginia, Pennsylvania, Georgia, and Maryland.

68.     RBC Bank (USA) is a nationally chartered bank with its principal place of business in North Carolina.

69.     Branch Banking and  Trust Company of South Carolina is a nationally chartered bank with its principal place of business in South Carolina and has banking locations throughout North Carolina.

70.     Branch Banking and  Trust Company is a nationally chartered bank with its principal place of business in North Carolina.

71.     SunTrust Banks, Inc. is a nationally chartered bank with its principal place of business in Georgia and regularly does business in North Carolina, South Carolina and Maryland.

72.     Cooperative Bank was closed by the FDIC in June of 2009.  To protect depositors, the FDIC entered into a purchase and assumption agreement with First Bank, Troy, North Carolina, to assume all of the deposits of Cooperative Bank.

73.     First Bank is the successor to Cooperative Bank pursuant to that certain Purchase and Assumption Agreement dated June 19, 2009.  It has its principal place of business in Troy, North Carolina and regularly conducts business throughout North Carolina.

74.     First Citizens Bank is a wholly owned subsidiary of First Citizens Bancshares, Inc., a bank holding company based in Raleigh, North Carolina.  It conducts business regularly in both North and South Carolina.

75.     First National Bank of the South was closed by the FDIC in July of 2010.  To protect depositors, the FDIC entered into a purchase and assumption agreement with NAFH National Bank, Miami, Florida, so to assume all of the deposits of First National Bank of the South.

76.     NAFH National Bank is the successor to First National Bank of the South pursuant to that certain Purchase and Assumption Agreement dated July 16, 2010.  It has its principal place of business in Miami, Florida and regularly conducts business throughout North Carolina.

77.     Wachovia n/k/a Wells Fargo is a nationally chartered bank with its headquarters in Charlotte, North Carolina, and conducts business regularly in North and South Carolina.

78.     Yadkin Valley Bank and Trust Company is a North Carolina banking company that conducts regular business in North Carolina.  It was reorganized in 2006, and now goes by the name Yadkin Valley Financial Corporation.

79.     The term "Lender Defendants" means all of the foregoing bank defendants, together and separately.  For each instance where the term "Lender Defendants" is used, it is specifically meant to include all of the bank defendants, together and separately.

### 4) Homeowner Associations

80.     Cannonsgate at Bogue Sound Homeowners Association, Inc. is a North Carolina corporation operating in Carteret County, North Carolina.

81.     Craven's Grant Homeowners Association, Inc. is a South Carolina corporation operating in Georgetown County, South Carolina.

82.     Summerhouse on Everett Bay Homeowners Association, Inc. is a North Carolina corporation operating in Onslow County, North Carolina.

83.     For purposes of this action, all three homeowners association will be referred to, collectively and individually, as the HOA.

### 5) Appraiser Defendants

84.     Berthadale R. Best is a duly licensed real estate appraiser doing business in North Carolina.

85.     James S. Wagoner was a duly licensed real estate appraiser at all times relevant hereto, doing business in North Carolina.

86.     Emily L. Adams is a duly licensed real estate appraiser doing business in North Carolina.

87.     James S. Watson is a duly licensed real estate appraiser doing business in South Carolina.

88.     Alan Sullivan is a duly licensed real estate appraiser doing business in North and South Carolina.

89.     The term "Appraiser Defendants", as used herein, refers to the persons identified in this subheading (5), together and individually.

## C.     Non-Party Co-Conspirators

90.     Mark Dain ("Dain") is an individual and a resident of Virginia. Dain is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Dain has recently filed bankruptcy in the Eastern District of Virginia (Case no. 1011935) and is no longer a party to this litigation.  Dain is, upon information and belief, a non-party co-conspirator to the other Defendants. Dain is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

91.     Mark Jalajel ("Jalajel") is an individual and a resident of Virginia.  Jalajel has filed for bankruptcy in the Eastern District of Virginia (Case No. 09-11453) and is not a party to this litigation. Jalajel is, upon information and belief, a non-party co-conspirator to the other Defendants. Jalajel is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

92.     Aaron Hernandez ("Hernandez") is an individual who purports to do business as Metropolitan Investment Group and/or First Metro Mortgage (collectively known as "Metro"), however, upon information and belief, Metro is not a properly organized corporation, limited liability company or partnership. Hernandez is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Hernandez is currently serving a 66 month with the United States Department of Corrections following a plea and sentence agreement with the United States Attorney's Office and the Department of Justice arising out of the mortgage fraud complained of herein.

93.     Peter Neathery ("Neathery") is an individual who purports to do business as Metro, however, upon information and belief, Metro is not a properly organized corporation, limited liability company or partnership. Neathery is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

94.     Total Realty Management, L.L.C. ("TRM") is a Virginia limited liability company with its principal place of business at 12656 Darby Brook Court, Woodbridge, VA

22912. TRM has filed bankruptcy in the Eastern District of Virginia (Case No. 09−11938−RGM) and is not a party to this litigation. TRM is, upon information and belief, a non-party co-conspirator to the other Defendants for many of the acts complained of herein. TRM is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

95. Coastal Realty Group, LLC ("Coastal") is a Virginia limited liability company doing business in North Carolina. Coastal is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

96. Premier Realty Management LLC ("Premier") is a Virginia limited liability company doing business in North Carolina. Premier is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5).

97. Providence Global Financial & Technology Group, LLC ("Providence") is a Virginia limited liability company. Providence is a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Upon information and belief, this entity has been dissolved.

98. Infinity Partners, LLC is a North Carolina corporation, now in bankruptcy, and acted as a "developer" as that term is defined under the ILSA 15 U.S.C. § 1701 (5). Infinity is identified in this action as a non-party co-conspirator.

## IV. FACTUAL ALLEGATIONS

### A. R. A. North Acquires Cannonsgate

99. Defendant RAN[1] acquired approximately 300 acres in Carteret County, North Carolina, which came to be known as the "Cannonsgate on Bogue Sound" subdivision on July 8, 2005. Rather than using bank financing, RAN sought out and received private funding for the project from one of the Allen Related Entities, Cannonsgate Investments, LLC. RAN purchased

[1] For purposes of this Complaint, RAN and RAN I will sometimes be identified as "RAN".

Cannonsgate property for $19,420,556.08. The seller took a $16,000,000.00 purchase money deed of trust and Wilson/Cannonsgate Investments, LLC loaned RAN $12,000,000.00, receiving a deed of trust subject to the purchase money deed of trust.

100. According to the Superseding Indictment of Ruffin Poole RAN repaid the investors, Cannonsgate Investments, LLC and/or Wilson, from a portion of the proceeds from the closing of each pre-sold lot in Cannonsgate and guaranteed a return on investment of 25 - 30% within one year. For example, as an investor, Wilson received $600,000.00 as a finder's/consulting fee payable at closing and was guaranteed a return of principal and interest (referred to in the promissory note as a *fee amount*) of $3,000,000.00 no later than one year from closing. Notably, the loan agreement also contained representations and warranties that RAN had all necessary governmental approvals and permits required for the development of the property. Upon information and belief, this was a false representation.

101. The Superseding Indictment of Ruffin Poole also alleges that the model used by RAN for Cannonsgate would result in a gross return equal to four times the cost of financing the project. This four hundred percent return on investment was then utilized in the following manner: (i) 25% used in repaying the financing of the project; (ii) 25% to market the project; (iii) 25% to construct the necessary infrastructure and amenities; and (iv) 25% profit.

102. In order to meet these steep obligations to its investors, RAN predicted sales would result in *at least* $111,000,000.00. Even prior to acquiring the property, however, RAN had received reservations for nearly all of the lots at Cannonsgate, Phase I. On June 24, 2005 RAN sent an email to its sales staff stating that "Phase II prices at Cannonsgate at Bogue Sound will be increased on July 25, 2005 at 9 am *a minimum of 10%*".

103.    The first closing in Phase I in Cannonsgate occurred on October 26, 2005. Closings on Phase II all occurred after December 8, 2005.

**B.     R. A. North Acquires Summerhouse**

104.    Sometime in early 2006, Defendant RAN entered into an agreement to acquire 515 acres in Onslow County, North Carolina.  This undeveloped parcel was subdivided and came to be known as the "Summerhouse on Everett Bay" subdivision.  As in the case of Cannonsgate, RAN acquired Summerhouse through an investment/loan from Wilson and a second lender for $32,000,000.00.  Wilson's portion of the investment/loan was $16,000,000.00 and he and his group were guaranteed repayment of the $16,000,000.00 along with a profit of 25% no later than one year from closing.

105.    The loan to RAN was signed on June 20, 2006 and included representations and warranties that the borrower had all necessary governmental approvals and permits required for the development.  On information and belief, this was a false representation.

**C.     Maryville Acquires Craven's Grant**

106.    Defendant Maryville acquired property in Georgetown County, South Carolina, which came to be known as the "Craven's Grant" subdivision sometime prior to April 7, 2006 for approximately $8,000,000.00.  Maryville acquired Craven's Grant through mortgage financing from, among others, Carolina First Bank and was subject to a blanket lien to be released upon the sale of a certain volume of lots. Soon thereafter, Maryville began reselling the improved lots in the range of $199,000.00 (for descriptive purposes only, these sales are described as the "fair market sales price"). At some point during 2006-2007, Maryville conveyed all or part of its property to an entity known as Cravensgrant II, LLC, a limited liability company wholly owned

by Maryville. For purposes of this Complaint, Maryville and Cravensgrant II, LLC are sometimes referred to, collectively, as "Maryville."

**D.** **The Promotion and Selling of Summerhouse, Cannonsgate and Craven's Grant**

107.     The first phase of the scheme involved creating frenzied, artificial demand through a standardized marketing approach that falsely touted the high value and high demand for the properties in the subject developments. The marketing approach included the dissemination of misleading, deceptive and/or false marketing material to potential purchasers and their agents in the United States through the use of the mail and wires. The intense, artificial demand created for the initial developments (*i.e.* Cannonsgate and Summerhouse) was an integral component of the scheme, as it laid the groundwork for successfully implementing the succeeding steps in the scheme.

108.     The standardized approach used to develop the appearance of high value not only involved touting the amenities and features of the developments but also the creation and manipulation of property values through the use of fraudulently manufactured, bank-ordered appraisals.

109.     Defendants' scheme required the creation of high comparable sales figures for the appraisals through various techniques including: (a) using inappropriate comparables for appraisals; (b) creating documents to reflect property transfers that did not exist; (c) transferring properties to Southeastern employees or associates at artificially high prices to subsequently be flipped to an innocent purchaser; (d) purposefully soliciting and utilizing cash purchases (including making a bogus sale appear to be a cash sale) to serve as artificially inflated comparables for appraisals; and (e) promises of guaranteed funding and/or other special treatment by banks and/or developers.

110.     Southeastern, the marketing group controlled by Gary and Randy Allen, had a budget exceeding several million dollars to hold lavish parties and large scale meetings where the benefits of lot ownership were "promoted." Southeastern and the other Sub-Developer Defendants offered trips, private transportation and luxury accommodations in order to induce the potential buyers to come to the many open houses sponsored by all Defendants. Southeastern distributed highly stylized promotional material complete with carefully crafted, personal testimonials from "average people" who had profited from buying and selling lots within months of their initial purchase.   On information and belief, these testimonials were completely manufactured.

111.     Through a series of exotic and elaborate open houses, parties and events, the Plaintiffs were induced to believe that the property had unique investment value and that, based upon the "experience" of the other Developers' customers, including Sub-Developers, these Plaintiffs were certain to obtain a substantial return on investment after only months of ownership.

112.     In the case of the Sub-Developers, the centerpiece of the presentation offered by TRM and others was a PowerPoint presentation which, among other things, promised that new buyers would benefit from a 50% discount the Sub-Developer received from RAN or Maryville which in turn allowed the Sub-Developer to give the Plaintiffs "larger rebates." One example was TRM's PowerPoint presentation which also addressed "The Risk" involved:

- The only risk-free endeavors are Savings accounts and CDs;

- Risk is hedged by eliminating costs for 2 years and putting money in the bank from the beginning; and

- *Appraisal satisfaction guaranteed*.

It is uncontested that each of the Defendant Sub-Developers disseminated the same information about the investment in the form of a color brochure that offered a number of promises which were designed to deceive potential investors like Plaintiffs herein.

113. All Developer and Sub-Developer Defendants, especially Southeastern and TRM, used "invitation only" mailings, in some cases charging the potential investors $99 to attend, in order to create a frenzy among purchasers that this investment was, indeed, exclusive and fleeting unless they acted quickly. Otherwise, all Developer and Sub-Developer Defendants absorbed the costs associated with these substantial and expensive open houses, creating the impression in the minds of Plaintiffs that the project was well funded and that the successful return on their investment was certain.

114. The Allen Entity salespeople were also instructed to make false statements during the launch events in order to mislead purchasers and create demand. For example, according to numerous purchasers, while giving tours of the properties, Allen salespersons often made statements concerning lots that "just sold" (when in fact they had not) or falsely indicating that inventory was almost sold out.

E. **The Manipulation of Prices in Cannonsgate and Summerhouse**

115. The first Subdivision in the fraudulent scheme was Cannonsgate. Cannonsgate was divided into two phases; predictably, Phase I and Phase II. Phase I sold out quickly and the Allen brothers saw an opportunity for bigger profits by increasing the prices in Phase II.

116. Phase II lots are similar or identical to Phase I lots, but the Allen brothers seized on the opportunity to greatly increase the prices in Phase II. They solicited Offers to Purchase at substantially inflated prices but it soon became apparent that in the absence of some comparable sales at the inflated prices, the Offers to Purchase they had solicited from new buyers would

never meet the Lender Defendants' underwriting requirements because they were vastly over-priced. As a result, the Allen brothers and their business investor, Therrell, as well as their employee and director of sales, Bednar, entered into sham contracts for the purchase of lots in Phase II for the sole purpose of creating comparable sales data. See Exhibits 34 and 35. The sale of these lots to Therrell and Bednar at prices in excess of those in Phase I lots is simply without explanation because, among other reasons, Therrell and Bednar had a right to purchase at a 15% discount and had done so in the past. Yet Therrell and Bednar bought the Cannonsgate II property for cash, at grossly inflated prices. At the very least, logic would dictate that Bednar and Therrell would get a great deal (*i.e.*, a 15% discount on the fair market value of the property), but that did not happen here.

117. For example, in Phase I, Bednar, using his company alter ego, Santa Rosa, purchased lot number 497 and financed the purchase through First Bank on October 26, 2005 with his 15% employee discount. But on December 8th, 2005 Bednar purchased Lot 522 through his company, Santa Rosa, for $699,000.00, cash and with *no* 15% discount. In fact, the Offer to Purchase was first delivered to RAN on the day of the sale, and the "closing" took place six (6) hours later. With the exception of the co-defendant Therrell, no single closing occurred on the same day as the offer to purchase.

118. Bednar put his Cannonsgate II property back on the market *on the same day he bought it*—December 8, 2005—for the same $699,000.00. The premise that Bednar's purchase was legitimate is betrayed by the fact that Bednar's intended resale for the same price means that he would pay commissions to a real estate broker and automatically lose money in any subsequent sale.

119.     That Bednar's purchase is utterly contrived is further evidenced by the subsequent transfer of title.  On February 13, 2008, Bednar transferred title to another Allen Enterprise company, Waterfront Development Services, Inc. without disclosing the sales price and failing to pay any transfer tax.  Thus, the consideration – if any – is not disclosed on the public record.

120.     In like manner, Therrell purportedly purchased lot 520 in Cannonsgate, Phase II with cash for the price of $699,000.00 on December 8, 2005.  Like Bednar, Therrell's offer to purchase was received on December 8, 2005 and closed the same day. Like Bednar, the property immediately went back on the market, for the purchase price of $699,000.00, subject to a broker's commission.

121.     On July 10, 2006, Therrell liened the property for the sum of $550,000 and discharged that mortgage 36 days later on August 15, 2006.  Notably, however, Therrell had already "sold" the property back to another Allen Related Entity, Defendant Waterfront Development Services, Inc. on July 11, 2006 purportedly for $781,500.  Therrell was offered the opportunity to explain the circumstances surrounding granting the lien interest on his property and the subsequent, almost immediate, sale to RAN and he declined.

122.     These bogus sales occurred after a telephone call made to Watts from either Ryan Butt, a well regarded appraiser, or a representative of one of the Lender Defendants, who informed Watts that the prices in Cannonsgate, Phase II could not be supported by any recent sales in Cannonsgate. Watts claims that he retained the telephone records from that telephone call indicating that the call was received at 9:55 PM on December 7, 2005.  Watts has refused to tender these records to Plaintiffs.

123.     Watts then placed a call to Gary Allen, in response to the information that no appraisal could reach the $699,000.00 threshold.  Watts claims that he told Gary Allen that the

appraisals could not support the contract prices in Cannonsgate, Phase II and questioned whether he should instruct the Allen sales force to contact the proposed purchasers and advise them that the sales would be recast at a lesser amount.

124.     Upon information and belief, Gary Allen advised Watts that he "would handle it". Less than 12 hours later Bednar and Therrell made their phony offer to purchase, for cash, and closed that same day.

125.     These bogus sales represent a huge spike in the sales prices charged in Cannonsgate, Phase I, but the lots lack any distinguishing factors from any Phase II lots other than the Allen brothers' greed and the potential of using complicit appraisers to support the price by selective use of comparables, in violation of the Uniform Standards of Professional Appraisal Practice ("USPAP").  Indeed, the average sale in Cannonsgate, including "premium lots" prior to the Bednar and Therrell transactions was $452,000.  When asked why he was paying $699,000 for property that was selling for a little over half that price, Bednar commented to a co-worker "Gary told me to so we would have a comp to justify our new prices"

126.     Thereafter, the scheme was facilitated by certain hand-picked appraisers who used the bogus Therrell and Bednar sales, and others that followed, as the comparables for the purpose of evaluating the potential sales to new buyers in Cannonsgate, Phase II. A cash sale is considered the highest level of corroboration for a property's fair market value.  Ultimately, fraudulent appraisals were created for the Lender Defendants through the careful selection of only those comparables that supported the artificially increased prices, and inventing values for the real estate that could not legitimately be supported by the market.

**F.     Similar Acts by the Allens**

127.     The use of straw-man transactions is nothing new to the Allen Enterprise.   For example, Gary Allen and Randy Allen own two developments in Houston Texas, known as the Sanctuary at Costa Grande ("the Sanctuary") in Calhoun County, Texas and Beachside in Matagorda County, Texas.   These developments started in 2006, with virtually no sales to third parties throughout that year.   Undaunted, the Allen brothers used a plethora of different alter-ego companies and limited partnerships to create the illusion that the properties had significant value when the truth was the properties were grossly overpriced.

128.     Just like their conduct in Cannonsgate and Summerhouse, the Allens sold the Texas lots to insiders for the purpose of increasing the "comparables" for appraisal values using complicit appraisers.

129.     In Texas the evidence demonstrates:

    a.     D.H. Palacios Development, LP is a company owned and controlled by the Allen brothers. It sold Lot 179 in Beachside to another company owned and controlled by the Allen brothers known as ORD Corp. The consideration is not noted on the deed because it was a cash sale. See Exhibit 36.

    b.     D.H. Palacios Development also sold Lot 246 in Beachside to ORD Corp. on the same day for nominal consideration. See Exhibit 37.

    c.     ORD Corp. then conveyed the property to Rita Collins - the Allen brothers' aunt - for the sum of $998,724.27 with a "vendor's lien", the equivalent of seller financing, for the entire purchase price. The mortgagee is none other than RA North.   More telling, Rita Collins, the Allen brothers' aunt, lists her home address as 3129 Springbank Lane, Suite 200, Charlotte, NC, the corporate address for RAN.   Finally, Rita Collins is an officer of one of the many affiliated companies, associated with Southeastern. See Exhibit 38.

    d.     The Defendants replicated this same process in the Sanctuary.   There, RAN used another dummy company, D.H. Texas Development, L.P. to sell Lots 73 and 276 in

the Sanctuary to the R. Douglas Therrell Family Limited Partnership for nominal consideration. The "sale" took place in November, 2006.

        e.    R. Douglas Therrell Family Limited Partnership then conveyed the property to Rita Collins pursuant to a Warranty Deed with Vendor's Lien. However, the "vendor" is described as ORD Corp, but the document is signed and sealed in the name of R. Douglas Therrell Family Limited Partnership, by R. Douglas Therrell. Notably, R. Douglas Therrell is not an officer or director of ORD Corp and his family limited partnership does not occupy any corporate position with ORD Corp. See Exhibit 39.

        f.    Simultaneously, Rita Collins then executes a Deed of Trust for all of the properties described above in favor of RA North for $998,724.27. See Exhibit 40.

        g.    The only distinguishable feature differentiating these two sales is that the Allen Enterprise got the name of the "vendor" right on the Beachside sale. Otherwise, these fraudulent sales have all the "marks of fraud" commonly associated with mortgage fraud litigation.

## G.   The Allen Related Entities, Randy Allen, Gary Allen, Wilson, Bednar, Therrell, Watts, Woolard, and Poole Actively and Knowingly Participated in All Aspects of the Scheme.

    130.    The Allen Entities, at the direction and under the control of Randy Allen and Gary Allen, actively participated in the fraudulent scheme to artificially create inflated prices for properties in Summerhouse, Cannonsgate and Craven's Grant. The Allen Entities, its employees and agents, were deeply involved in the scheme and played an active role in orchestrating aspects of the scheme including participating in activities that created artificial demand in the Subdivisions, manipulating the prices of property in the Subdivisions through fraudulent appraisals, exerting control over the availability of properties for sale and resale, and enlisting and supporting the efforts of the Sub-Developers in the perpetuation of the fraudulent scheme.

-30-

131.    The sham purchases of Lots 520 and 522 at Cannonsgate by Bednar (through "Santa Rosa") and Therrell were recorded in the Carteret Register of Deeds at a time that the Allen Entities, Bednar and Therrell had actual knowledge that the cash sales described therein would be used for unlawful purposes.   The fraudulent sales prices were made available to appraisers by the use of a database relied upon by other appraisers who used these "sales" and others that followed as a basis for setting the artificially high values for the properties in Cannonsgate and later in Summerhouse. On information and belief, these appraisers knew or should have known that the Bednar and Therrel sales were phony.

**H.    The Allen Entities, Together With Wilson And Poole, Made Extraordinary Contributions To The Reelection Campaign Of Governor Easley For The Purpose Of Securing Favorable Treatment Of Planned Subdivisions Including Cannonsgate.**

132.    18 U.S.C. § 201 (b) states:

(b) Whoever--(1) directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent--
(A) to influence any official act;

(B) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

(C) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of the lawful duty of such official or person; shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

133.    The Allen Entities violated 18 U.S.C. § 201 (b) in multiple ways. For example, the Superseding Indictment against Poole states:

*As [Wilson] became more personally involved with Poole, he was able to utilize this relationship with Poole to obtain the appointment of friends and family to various boards and commissions. Poole, due to his position as the primary*

*contact between the Governor and the Office of Boards and Commissions, was in
a position to assist the Wilmington Financier. (Superseding Indictment ¶13)*

134.    The Allen Entities began their inroads to gain political favor as early as 2002

during the creation of another development known as Oyster Bay. In order to build the planned

waterway park within the Oyster Bay development, the Allen Entities were required to obtain

approvals of a number of Divisions within the Department of Environment and Natural

Resources ("DENR") and the United States Department of Army, Corps of Engineers ("the

Corps"). Sometime in September, 2002, Wilson asked Poole to make inquiries regarding the

status of the Oyster Harbour permits.

135.    The Superseding Indictment further states:

> *In June of 2003, the Oyster Harbour Developer had still not obtained the
> Coastal Area Management Act ("CAMA") permit from DENR on the Oyster
> Harbour project. At this juncture, the Wilmington Financier helped arrange for a
> meeting between the Oyster Harbour Developer, the Governor, and the
> Governor's chief campaign fundraiser. In preparation for the meeting, on June 3,
> 2003, the Wilmington Financier sent an e-mail providing the following
> background information to the Governor's chief fundraiser:*

> *The [Allen Entities] needs the Governor's assistance on obtaining a permit
> for the construction of a boat ramp on the intracoastal waterway in Brunswick
> County - Oyster Harbour subdivision. Ruffin is familiar with the issue and I would
> suggest that you touch basis with him on the status of the permit in case this issue
> is raised at the meeting.*

> *According to [Wilson], the goal of the meeting was to make the [Allen
> Entities] feel obligated so that would make a large contribution to the North
> Carolina Democratic Party. It was [Wilson's] understanding that the funds
> provided by the [Allen Entities] to the North Carolina Democratic Party would be
> earmarked to be used on behalf of the Governor's 2004 campaign. [Wilson's]
> interest in securing political contributions for the Governor's benefit was to
> ensure continued access to the Governor's Office for assistance with obtaining
> appointments and matters pending before state agencies.*

> *[Gary Allen] met with the Governor in the Governor's Mansion on June 4,
> 2003. On June 26, 2003, Poole communicated with the Director of Coastal
> Management and the permit coordinator assigned to the Oyster Harbour project
> On June 27, 2003, [Gary Allen] wrote a check in the sum of $50,000 made
> payable to "The North Carolina Democratic Party."*

By letter dated July 25, 2003, the Allen Entities filed a revised CAMA permit application. In response to the revised CAMA application, the Corps sent the following memorandum to DENR on August 26, 2003: "The Corps will need to send this modification to Federal Agencies for review & comment." Later that same day the Director of Coastal Management sent the following e-mail to her subordinates: "[Poole] wants to know who in the Corps notified you of the Corps' need for more review time and he'd like a copy of our field recommendation faxed to him.

On August 27, 2003, the head of the DENR Permits and Consistency Unit provided a written response to Poole's questions and telefaxed the memorandum to Poole. On October 31, 2003, the CAMA permit was issued on the Oyster Harbour project. The Oyster Harbour CAMA permit was modified in 2004, based on an agreement reached by the CAMA Commissioner, who owns Rowboat Company, and the District Manager of Coastal Management.

On December 11, 2003 – December 14, 2003, [Wilson] and about five other persons, including Poole, vacationed together in Costa Rica. [Wilson] paid the $26,476.25 cost of the chartered jet used for the trip to Costa Rica. [Wilson's] intent in including Poole on his annual Costa Rica trip was to further strengthen his access to the Governor's Office. (Superseding Indictment ¶¶ 43-51)

136.    The Allen Entities made additional contributions to Governor Easley's campaign for the purpose of strengthening their access to the Governor's office. On August 24, 2004 the Allen Entities wrote a check to the North Carolina Democratic Party in the amount of $50,000.00. Wilson wrote a check for $10,000.00 to the North Carolina Democratic Party during the same time period. Each Defendant understood that these funds would be specifically earmarked for the benefit of the Governor's reelection campaign.

137.    In early, 2005, the Allen Entities finalized an agreement to purchase the property that would become Cannonsgate. The application for a waste water treatment was shepparded through the approval process by Poole at the request of the Allen Entities and Wilson. As one of the Allen Entities' employees later remarked in a January 23, 2006 letter:

One [additional] point I forgot to mention earlier today is that when making your decision you should consider the timing it will take to close on the property for anyone who must put in a private water treatment plant to bring sewer to the property. This process normally takes in excess of 1 year, however between the

*contacts that [Garry Allen] and I have we were able to reduce this by nearly half in the [Cannonsgate] property he purchased through [name removed].*

**I.    Kickbacks to Government Employees from Allen Entities**

138.    The Allen Entities provided kickbacks through their agent Wilson to governmental employees, including but not limited to Poole, to receive favorable consideration concerning DENR permits and to gain unique access to any and all aspects of governmental oversight of the project at a time when Poole was actively employed by the Governor of North Carolina.  No Defendant revealed to any Plaintiff the existence of these kickbacks.

139.    For example, despite the fact that the investment in Cannonsgate had already been funded and there was no need for additional investors, Poole was permitted to invest $100,000.00 with a guaranteed return of 30% in less than one year.  In fact, Poole invested the $100,000.00 on September 1, 2005 and was paid $130,000.00 by December 18, 2005.  This transaction was for no other purpose than to pay Poole $30,000.00 as a kickback.

140.    In addition to receiving windfall profits, Poole was Wilson's guest, again, for an all expense paid trip to Costa Rica.  Wilson paid $26,087.00 for the cost of the chartered jet used for the trip to Costa Rica.

141.    With the knowledge that the return on investment was guaranteed, Poole asked to be allowed to invest in the acquisition of Summerhouse.  His investment was not important for the overall funding of the project, but Wilson and the Allen Entities knew that Poole had access to and influence over governmental agencies whose approvals were necessary for completing the project.  Therefore, Poole was allowed to invest another $100,000.00 which he did on June 30, 2006. Poole received $130,000.00 in incremental payments with the final payment on January 4, 2007.  Like his other "investment," this transaction was for no other purpose that to pay Poole $30,000.00 as a kickback.

142.    As a consequence of providing guaranteed kickbacks to Poole, the Allen Entities were assured that permits would be forthcoming in a quarter of the time required for nearly any other project of its kind.

143.    For example, in mid-2006, Wilson asked Poole to help with problems at DENR regarding the construction of boat docks and ramps at Summerhouse. Poole responded that the problem was taken care of.

144.    The Superseding Indictment notes the record times for approval of Allen Entities' application for CAMA permits:

> On July 21, 2006, Coastal Management received an application for a CAMA permit for the development of Summerhouse. On August 14, 2006, Coastal Management released the application to other sections of DENR and other agencies.
>
> On September 12-14, 2006, the [Allen Entities] provided additional information to the Division of Water Quality in connection with the CAMA permit. On September 14, 2006, a CAMA permit was issued authorizing the [Allen Entities] to construct a "10-slip docking facility and boat ramp." (Superseding Indictment ¶¶112-113).

145.    Once again, on December 7-10, 2006, Wilson paid for a chartered jet to take Poole to Costa Rica at a cost of more than $28,000.00.

146.    Kickbacks were not limited to Poole, however.  On December 22, 2005, former Governor Mike Easley closed on his purchase in Cannonsgate, purportedly paying $549,880.00 for the lot next to the Bednar and Therrell lots that had just "sold" for $699,000.00.  The Governor's sale, however, did not disclose that the Allen Entities gave the Governor nearly $137,000.00 in cash rebates reducing the price the Governor paid for his lot in Cannonsgate, Phase II to a fraction of the Allen's advertised sale price for like-kind properties in the development. This transaction was for no other purpose than providing a kickback to Governor Easley.

**J.     Use Of Mail And Emails As A Part Of The Scheme**

147.     The Allen Entities' sales force, through the efforts of Watts, Bednar and Woolard, participated in all aspects of the scheme through the use of false, fraudulent mailings, emails and phone calls, which misrepresented the demand in the Subdivisions and manipulated the sales price for lots in the Subdivisions.  For example, on January 12, 2006, Southeastern used the United States Postal Service to mail letters to Cannonsgate property owners to bid on a "limited number of boat slips" available at Cannonsgate, including a "preferred drawing" at a time when no such demand was in place.

148.     Southeastern used the United States Postal Service to mail advertisements to prospective individuals claiming those individuals' right to participate in a "Sneak Preview Reception" at The Peninsula Chicago, located in Chicago, Illinois, on January 31, 2007, describing the recipient as a "preferred guest, entitled to a preview" of Cannonsgate.

149.     In addition, the Allen Entities engaged in email communication with the Sub-Developers for the purpose of communicating information required to perpetuate the fraudulent appraisal practices with the Lender Defendants.

150.     Additional instances of Defendants' respective use of the mails and wires are embedded throughout this Complaint.

**K.     Allen Entities Perpetuate the Scheme Through TRM, PRM and Others**

151.     The Allen Entities' sales force, through the efforts of Watts, Bednar and Woolard, participated in all aspects of the scheme through the introduction and endorsement of the Sub-Developers into the project, forming a "partnership" whereby Plaintiffs were fraudulently induced to purchase the Properties through corrupt and unlawful means, as more fully described herein.

152.    By June 27, 2006 Dain of TRM emailed Watts and Woolard, complaining that he needed more property to sell in all three of the subject Subdivisions:

> *"If you and I can not make the #'s work on cravens I need a new game plan. I will need cannonsgate's to replace them as I have already planned on the revenue and I have 42 approved buyers with lynne (b of a) and suntrust who are expecting to close on something in the next 2 weeks".*

153.    On Friday, July 7, 2006 Dain sent the following email to Watts and Woolard:

> *MW-MW*
> *I have 5 or 6 in appraised at 360-380k 3 attached. LET ME KNOW WHAT YOU ALL THINK LYNNE IS GONE ALL NEXT WEEK! If you all get Lynne and Christine to use Carolina first's appraiser this would make my day...and yours Let me know if you all can make this work. I would need no credits at all from you. I still need 10-15 new lots, cravens if this appraiser works with SunTrust and b of a...or 15 Cannonsgates.*
> *Please advise...*
> *Thanks*
> *Mark*

154.    The appraisals were the backbone of the conspiracy. An appraisal was only sufficient if it supported the pre-determined, inflated sales price set by the Allen Entities. For example, on Wednesday, July 12, 2006 Dain sent the following email to Watts:

> *"Suntrust appraisals 390k on cravens on interiors"*

This information – that an interior lot at Craven's Grant was appraised at $390,000 – was an enormously significant event to the Defendants for two reasons. First, it meant that Suntrust and the Developer Defendants had succeeded in arranging for corrupt appraisers to value interior lots at Craven's Grant for $390,000. Second, these lots would later become the new comparable sale lots for other sales at grossly inflated prices.

155.    The Allen Enterprise's conspiracy to rig the appraisals in connection with the hyper inflation of lot prices had been fully endorsed by Watts, Woolard and several Lender Defendants. In another email, dated Monday July 24, 2006 to Watts and Woolard, Dain said:

*"We lowered all loan amounts on all Lynne's deals. She has 4 mil in
cravens grant lots. I think we can close all by next Friday if you get her to use the
appraiser mckenzie or use the 2 comps I faxed mace at 385K."*

156.     Dain was therefore relying upon Watts and/or Woolard to convince the Bank of

America loan originator, Lynne Cooke, to manipulate the appraisal process.

157.     On August 2, 2006 Dain told Watts and Woolard about the status of the appraisals

in Craven's Grant being performed by appraisers selected by Bank of America's Lynne Cooke:

> *Mike and Mace*
> *Cravens grant Lots 65 and 148 appraisals are being done again with the 4 new
> recorded comps of 380k.*
> *If these 2 come in at value Lynne will have the other 10 redone the same way that
> would get us 3 million closed with her next week.*
> *Hope to know tomorrow…*
> ***Mark dain***
> ***CEO***
> ***Total Realty Management***

158.     On August 3, 2006 Dain told Watts and Woolard that the appraisals in Craven's

Grant being performed by appraisers selected by Bank of America's Lynne Cooke were

successful:

> *CRAVENS BOA DEALS CAME IN AT 385K ON INTERIORS LYNNE IS BACK IT
> SEEMS-THANKS FOR THE HELP MIKE AND MACE*
> **Mark dain**
> **CEO**
> **Total Realty Management**

159.     On Monday, August 7, 2006 Dain summarized the then-sold sold properties to be

closed to Watts and Woolard:

> *Mike and Mace*
> *I tried to call you all back but receptionist says you are in closed door meeting.
> We have 66 total deals w/cannons and cravens (provided Lynne comes through
> with her 3 mil which I think she will) all will close by the 21st all 66 deals all
> $14,000,000. All lots are sold and with the banks. I can only close them as fast as
> the banks do. Mike McCracken is emailing you specific closings dated for each
> lot.*

-38-

*23 cannonsgate left to close*
*43 cravens left grants to close*
*That is an exact number of 66 lots to close out these 2 communities*
**Mark dain**
**CEO**
**Total Realty Management**

160. By October 10, 2006, Dain had identified the following Lender Defendants as having participated in fraudulent loans and communicated this information via email for Watts and Woolard:

| | | |
|---|---|---|
| *BOA* | *38* | *Most should be closed by the end of the month* |
| *CF Carolyn King* | *19* | *All will close this month* |
| *Suntrust* | *5* | *Will close this month* |
| *BB&T* | *5* | *Will close this month* |

161. December 11, 2006, Dain was reporting a summary of the closings done during the year with the rigged appraisals and as a part of the Allen Entities' scheme to sell the properties at grossly inflated prices:

| | |
|---|---|
| *102 summerhouse closed as of today* | |
| *197 total closed ytd* | |
| *Cannonsgate $8,299,000.00* | *20* |
| *Cannonsgate 2 $16,895,000.00* | *41* |
| *Cravens Grant $12,775,000.00* | *34* |
| *Summerhouse $33,580,000.00* | *101* |
| *Total $71,549,000.00* | *197* |

162. Randy Allen and Gary Allen provided direction and support for the fraudulent scheme of the Sub-Developers. For example, on Tuesday, May 8, 2007 Dain wrote the following email to Watts:

*Mace I have under 40 lots left in my inventory. let me know now if you can help or not. I need something I can start closing on by july-august. I need another 300 units in addition to summerhouse. If you have nothing maybe you can refer me to someone who can help. By the way I can get the 20 mil for that nice piece or we can pre sell it and pay the seller on takeouts. If its icw and its 400 total lots we can get a $180,000,000 sellout if 75 are waterfronts and 325 interior. We would make another chunk partnering with a builder or 2 on the home package. How many are waterfront?* **I think gary is already on that deal he mentioned it at the**

*promotion actually I'm sure he mentioned it so why are u telling me about it?*
*Don't waste my time and don't go in your fucking hiding mode if u want to do a*
*deal you weak bitch. No wonder you have a boss you need one. Actually bedner*
*says you have 2 bosses! (emphasis supplied)*

163.    In May, 2007, Dain complained that the Allen Entities had been offering the same

deal TRM was exploiting to TRM's competition.  On May 18, 2007 Dain was angry with Watts

and Woolard and suggested that his competition, Metro, was acting in a way that was likely to

create problems for the entire group of co-conspirators:

> *"investment" I remember Gary saying not to say that ever.............besides trying to*
> *copy me word for word they run across to many of my people ... I am sick of it.*

164.    The following day, Dain sent another email to Watts and Woolard and explained

his dissatisfaction with the agreement between the Allen Entities and TRM:

> *This is out of control. Groups that you sell to for some odd desperate*
> *reason are refusing to give closing docs to people. they are guarantying resale's*
> *in 6 months. Guys who do 11 deals a year are copying my web page word for*
> *word. Hernandez is using TRM letterhead and my clients testimonials!!! No joke*
> *he has my logo on his web site. Not your problem but it shows you who your*
> *dealing with. Take a look. Talking about "investment" all over web pages, web*
> *advertisements and internet links. Some other guy you sell to here is your*
> *"business partner" all the sudden and buyers can live next door to coach k he says*
> *in writing. Read the links I sent you! He puts in writing he is in partnership with*
> *you, the developer. Like I told you last night this needs fixed. I don't need this*
> *competition up here who combined does 10 percent of what ill do. Ill pick up the*
> *slack don't worry I'm doing 1000 deals somewhere. I'm sick of my buyers running*
> *into these fly by nights all the time. It makes this whole business look like a chop*
> *shop. I'm out of the program Monday if you decide to continue group sales in*
> *northern Virginia to anyone else but me. I can not believe you are doing private*
> *parties up here in Fairfax for groups other than mine that close nearly nothing.*
> *You have about zero loyalty. Unlike you I have turned down several developers*
> *who approach me because I like your product and believe in it. I keep thinking*
> *production will get me somewhere with you and it does not. No break on price.*
> *No higher rebate. You still let cowboys run wild. You sell one and twos for*
> *cheaper than my price! If I don't hear from ill assume you think I need to find*
> *another developer to work with. Just as you clearly don't need us I'm sure I can*
> *find someone to buy 1000 lots yearly from and have exclusivity in my area and*
> *think about this they may even give me a wholesale price so I can sell for a*
> *cheaper price point? Crazy. for trm to continue with you and your communities*
> *all these cowboys ads, flyers and web pages will need shut down Monday and no*

*other group sales can take place in northern va. I can flip 80 contracted buyers to a new developers job in a weeks time if you think I need to. These want to be real estate guys are going to put mine and your ass in a sling. All this stress and I'm still paying retail?? Something has to give here. If I'm going to close $300,000,000 by Jan 1 I need to feel good about it. These groups cost me more business than they give you! The SEC will be all over these guys in no time not to mention better business, HUD and the FBI. Oh this one takes the cake one the groups bounced a bunch of buyers interest rebate checks. How long before it all blows up? Then I will be assumed to be like the other groups. Let me know where you all stand on both issues, price and competition. Both need fixed fully. There will be no gray area on this. I need an answer Monday and no response ill come to my own conclusions.*

**L.   Sub-Developers Role in the Continuing Conspiracy**

165.    Soon after Cannonsgate, Phase II sales commenced, RAN and Southeastern were approached by Dain and Jalajel, owners of TRM (collectively referred to hereafter as "TRM") who sought an opportunity to sell lots in Summerhouse and to conduct re-sales in Cannonsgate. Bednar, Watts and Woolard were in the initial state of representing Maryville in the Craven's Grant Subdivision and, upon accepting the business arrangement with TRM, described above, began selling lots to TRM.

166.    In order to do business with Maryville, TRM represented that it had the ability to conduct the lavish launch parties in essentially the same manner as RAN and Southeastern had in the past. TRM agreed to absorb the substantial costs associated with those parties.  Because RAN's cost of marketing the properties was several million dollars, TRM's offer to re-sell the properties was attractive to RAN. Bednar, Watts and Woolard had the express consent from the Allens to enter into the agreement with TRM for the purpose of marketing and selling the properties within each Subdivision.  Thereafter, the parties entered into an agreement for RAN to pay a 5% commission on sales to TRM plus a small "marketing credit" on each sale.

167.    As a further condition to the agreement with TRM, RAN and Southeastern provided direction, guidance and support to the sales efforts of TRM including, but not limited

to, providing source material regarding the Subdivisions, advertising copy, literature and the physical presence of many of the Southeastern sales and marketing employees including Watts, Bednar and Woolard at sales events. Together, TRM and these Southeastern employees participated in the lavish receptions reminiscent of the parties thrown by RAN in the previous weeks and months to entice individuals to purchase lots at Cannonsgate and Summerhouse.

168.    Soon after TRM, RAN and Southeastern combined their efforts, TRM began publishing false and fraudulent information to prospective customers by email and regular mail claiming, among other things, that TRM owned a large volume of lots and could therefore sell the lots to the Plaintiffs at a substantial "wholesale" discount. In a few circumstances, TRM claimed to have an "option" to purchase lots at "wholesale" prices and again promised to pass the savings on to the Plaintiffs. None of these claims were true as at no time did TRM actually own title to the properties it was marketing as part of its "inventory." Instead, TRM used the Plaintiffs' mortgage financing to acquire title moments before "flipping" the property in a simultaneous closing to the Plaintiffs for prices 2-3 times the price paid by TRM. By way of example, see Exhibit 14 involving Plaintiffs Michael & Allison Holbert. None of this was disclosed to any Plaintiff.

169.    TRM, RAN and Southeastern utilized an elaborate sales pitch promising the Plaintiffs a substantial return on their investment in 6-18 months. In one or more cases, the Plaintiffs were advised that "most people in this deal are selling within 6 months to 2 years" for a substantial profit. It is uncontested that as of the date of that statement, TRM had not been in business selling lots in either Subdivision for 6 months to 2 years.

170.    Once the fraudulent scheme between TRM, RAN and Southeastern proved to be successful, other fraudulent Sub-Developers approached RAN and Southeastern in an effort to

duplicate the fraudulent scheme. For example, Scott Brogan, formerly an employee of TRM, became dissatisfied with his cut of the sales made by TRM and formed his own marketing, Sub-Developer organization known as Premier Realty Management ("Premier"). Premier's sales pitch was identical in every way to TRM's including the participation from Southeastern, Bednar, Watts and Woolard.  On July 12, 2006 TRM complained that Premier was getting the same deal from the Allen Entities and demanded that Watts cease communications with Scott Brogan of PRM:

> *Mace,*
> *Please do not discuss any trm business, appraisal issue, lot inventory or anything*
> *regarding trm at all with Scot Brogan.*
> *Thanks*

171.    Watts responded immediately:

> *Mark,*
> *Going forward, I will not discuss any TRM business with Scott Brogan.*
> *Mace*

172.    Notwithstanding the implied promise of exclusivity, the Allen Entities quickly joined forces with Premier, Coastal, Metro and Infinity Partners to perpetuate the fraudulent "flip" transactions.

**M.    Lender Defendants' Role in the Continuing Conspiracy**

173.    The acts complained of herein all took place between 2005 and 2007 when lax underwriting standards and methods for originating residential mortgages were commonplace. The Court is requested to take judicial notice of the widespread use of "no document", "stated income" and "paper saver" loan advertisements from all lenders led by the efforts of Bank of America's latest acquisition partner, Countrywide Mortgages, during the period before the bubble burst on the real property market in late 2007 and early 2008.  The sub-prime mortgage crisis that grips this nation today is a direct result of the widespread failure of mortgage lenders to

monitor the practices of their own loan originators and underwriters. The result of these practices is commonly referred to as the "Great Recession."

174.     All Lender Defendants engaged in improper and/or illegal underwriting practices that were the result of compensation models that awarded compensation to originating loan officers employed by the Lender Defendants based on loan origination amounts and loan volume—not loan quality. Thus, loan officers were incentivized by their employers, the Lender Defendants, to engage in improper underwriting practices to increase their individual compensation.

175.     For example, Lynne Cooke at Bank of America was awarded trips and bonuses for her work with the Allen Enterprise by Bank of America's compensation formula. BB&T operates (as do most other of the Lender Defendants) using what is known as the "Matrix" whereby loan originators can obtain year end cash bonuses equal to or even exceeding their base salary for mortgage origination.

## N.     The "700 emails"

176.     Plaintiffs' counsel interviewed individuals in January and February 2010 regarding the fraudulent practices of the Lender Defendants. In connection with those interviews, Plaintiffs received a CD containing nearly 700 email messages between the Lender Defendants and a number of other Defendants.

177.     The emails in the Plaintiffs' possession are a fraction of the email traffic between the many Lenders, the Allen Entities, the Sub-Developers and others. The emails referenced herein were provided to Plaintiffs in the course of this investigation. Notably, a companion case in Virginia, with many of the same Defendants, was the subject of a Rule 26(a) Discovery Order and subpoenas for the production of electronically stored information. The 700 emails fall

squarely within the requested documents, but none of the Defendants produced them, despite their legal obligation to do so.

178. That the Lender Defendants, RAN, Southeastern, Watts and Woolard refused to turn over the emails referenced herein in violation of the Virginia Plaintiffs' discovery requests is not surprising, but it is a clear and blatant violation of the Federal Rules of Civil Procedure, the Virginia District Court's 26(a) discovery order, as well as a violation of the obligation to produce documents conforming to the discovery requests of the Virginia Plaintiffs.

179. The Virginia case was, at one time, dismissed on FED. R. CIV. P. 12 (b) (6) motions on the Court's finding that the Plaintiffs' claims that a lender might actually loan money in circumstances where the lender was under-collateralized were implausible. The emails, had they been produced as required, not only prove that the fraudulent lending practices were plausible, but that they *actually happened*. The Virginia case has recently been reinstated as to defendant Bank of America.

180. It is uncontested that mortgage origination was a paramount goal of the Lender Defendants during the relevant period. Each of the Lender Defendants compensated their loan officers by generous commissions depending upon the type of mortgage product sold, and the amount of the loan. Non-conventional three to five year adjustable rate mortgages were more valuable as a sales product and it is uncontested that every Plaintiff was sold such product whether they could qualify for different financing or not. The compensation arrangement encouraged and actually rewarded bank employees for funding loans at any and all cost.

181. In a January, 2007 email to Watts, Lynne Cooke, a Bank of America loan officer, boasted about her participation with the Allen Entities, Dain and the other Sub-Developers:

*For 2006 I made Platinum Club here at Bank of America and it was my BEST year ever in most part due to the relationship that I have with you. Thank you for helping me get there.*
*Please keep in touch and let me know what I need to do and when. Thank you again Mace and I look forward to hearing from you soon.*
***Lynne Cooke***
***Mortgage Loan Officer***
***Phone: 704-386-0628***
*Toll Free: 800-678-6060*
*lynne.cooke@bankofamerica.com*

## O.    All Lender Defendants Knew About and Participated in the Scheme

182.    All Lender Defendants knew, or in the exercise of reasonable diligence should have known, that the market for the three Subdivisions at issue in this case had a finite limit to the value that a purchaser would ultimately place upon them. It is not credible that a non-corrupt Lender Defendant could believe that lots selling for "fair market value" could simultaneously increase in value 2 1/2 times in the course of a few months.

183.    Moreover, the Lender Defendants knew that no market could support a Ponzi-like scheme of ever increasing prices, made through flip transactions, with increasing prices, forever. Unless the Lender Defendants can demonstrate that there was never a limit to a sale price, the practice of exponentially increasing the sale price of these slivers of undeveloped dirt was unreasonably risky for the Lender Defendants' customers.

184.    Further, many of the Lender Defendants knew that the prices in the Developments were being wrongfully manipulated because the sales and appraisal data was patently inconsistent and inexplicable in the absence of fraud.  Many Lender Defendants closed loans within days of each other for nearly identical properties sold for vastly different amounts.

185.    The Lender Defendants conspired with the Allen Entities by publicly identifying themselves as "preferred lenders" for the sales of the fraudulent transactions.   The Lender

Defendants knew that the scheme required their active participation and were anxious to join the conspiracy, by and through their loan originators, simply based on their own greed.

186.    For example, Lynne Cooke from Bank of America openly communicated the nature and extent of the appraisal manipulations with the Allen Entities and the Sub-Developers:

> *From: Cooke, Lynne [mailto:Lynne.Cooke@bankofamerica.com]*
> *Sent: Friday, June 23, 2006 3:52 PM*
> *To: Mark Dain*
> *Subject: RE: send me any that you have also via email - THANKS!*
> *Here are the facts on the Craven's Grant appraisals that I have in at this time:*
> *Lot # Appraised Value*
> *49 $265,000*
> *68 $265,000*
> *61 $265,000*
> *62 $265,000*
> *These are all interior lots and approximately the same in size. According to the information that I have received these prices are in line with comparable interior lots in other comparable subdivisions, The Oaks, Harmony and South Island. We have ordered a recovery appraisal (meaning another appraisal from another appraiser) on the above 4 lots which we should have back on Monday. I have 5 others that are with a 3rd appraiser that should be in today, but I have not yet received them. I will keep checking and email you with that information once it comes in.*
> *Thank you and I will send you any other information that I receive ASAP.*
> *Lynne Cooke*
>
> ***From:** Cooke, Lynne [mailto:Lynne.Cooke@bankofamerica.com]*
> ***Sent:** Monday, June 26, 2006 3:12 PM*
> ***To:** Mike M*
> ***Subject:** Craven's Grant*
> *I received the second batch of appraisals back today that came from a different appraiser. I have not yet received the recovery appraisals that were done on the first 4. The values are as follow on the following:*
> *Lot 67 Kachold $210,000*
> *Lot 69 Devine $210,000*
> *Lot 63 Feeley $210,000*
> *Lot 114 Makris $230,000*
> *I will keep you posted as I get the rest. Thank you!*
> ***Lynne Cooke***
> ***Account Executive***
> ***Phone: 704-386-0628***
> ***Toll Free: 800-678-6060***
> ***lynne.cooke@bankofamerica.com***

187.     Note that Ms. Cooke's email uses the term "recovery appraisal."  A "recovery appraisal" is not an expression used in the appraisal business, nor is it within the generally accepted underwriting standards to assign an appraiser to do work for a lender and then seek a second, third or fourth opinion.  But here, all of the Lender Defendants (not just Bank of America) continued to seek out second, third and fourth opinions until they found an appraiser who would agree to put the figure where the bank and the seller wanted it.

188.     The Allen Entities had first-hand communication with the Lender Defendants on the issues relating to appraisals.  Despite the obligation to be unbiased and objective, clearly the Lender Defendants were catering to the needs of the Defendants rather than the Plaintiffs. On July 24, 2006 Dain noted in an email to Watts and Woolard:

> *We lowered all loan amounts on all Lynne's deals. She has 4 mil in cravens grant lots. I think we can close all by next Friday if you get her to use the appraiser mckenzie or use the 2 comps I faxed mace at 385k. She has new list of lowered prices. They are now all between 300k and 379k. Let me know thanks!*
> ***Mark dain***
> ***CEO***
> ***Total Realty Management***

189.     Each of the Lender Defendants participated in the fraudulent scheme as evidenced by the emails and the patterns described herein.  Notably, Lender Defendants BB&T and SunTrust are mentioned in the emails, with the content being consistent with the emails from Lynne Cooke and Dain, Watts and Woolard. For example, on July 6, 2006, Dain emailed Watts and Woolard advising them of Lynne Cooke's recent batch of appraisals as well as BB&T and Suntrust appraisals:

> *MW – MW*
> *Here are the final official highest numbers on the first batch of appraisals that Lynne sent McCracken today (we have our work cut out for us) Waiting on Christine Chapmen [BB&T] and VA suntrust #'s today maybe tomorrow we will have them.*

190.    Certainly RAN, SEWM, TRM, Premier, Coastal, and Metro could set up a fraudulent scheme, but they could not fund it.  The Lender Defendants chose to participate because they had the capital to invest in the project, and a compensation structure that made participation irresistible to their employees.

191.    The Lender Defendants' front-line loan officers were more than eager to perpetuate the fraudulent sales in the Subdivisions.  Many of the Lender Defendants took their orders directly from the Allen Entities or one of the Sub-Developers.  The following emails occurred on August 1 and August 2, 2006:

> *Let me know if Lynne gets back to you on Cravens Grant today.*
> *Every single file that can be moved has been moved.*
> *Still have 3 mil in lots with her (8 properties).*
> *Now 4 deals are on record at 380k and dispersed.*
> *Some of her sales prices are only 300k .*
> *Please advise...*
> *Mark*
>
> *Mike and Mace*
> *Cravens grant Lots 65 and 148 appraisals are being done again with the 4 new recorded comps of 380k. If these 2 come in at value Lynne will have the other 10 redone the same way that would get us 3 million closed with her next week.*
> *Hope to know tomorrow...*
> ***Mark dain***

192.    On August 3, 2006, just 48 hours after the Craven's Grant appraisals were deemed disappointing, Dain sent an apparently gleeful email to Watts and Woolard regarding the effort by Cooke to rig the appraisals:

> ***CRAVENS BOA DEALS CAME IN AT 385K ON INTERIORS. LYNNE IS BACK IT SEEMS-THANKS FOR THE HELP MIKE AND MACE***
> ***Mark dain (emphasis in the original)***

193.    All Lender Defendants knew or had reason to know that the conspiracy amounted to a Ponzi scheme necessarily requiring an ever increasing value for real property. All Lender Defendants knew that the goal of each of the borrowers was to flip the property because each of

the borrowers was promised that such a flip was not only possible but inevitable. The Lender Defendants' actual knowledge of the underlying scheme can not be genuinely denied because, among other reasons, each Lender Defendant had advance notice of the loan program designed by the Developers. Moreover, the Lender Defendants had representatives on site for many of the sales and informational meetings.

194. Therefore, the perfect storm had come to fruition. Aggressive corporate policies designed to create revenues from selling and servicing risky loans, coupled with an equally aggressive sales pitch (given credibility by the Lender Defendants' presence) and rigged appraisals joined together to create a massive fraudulent mortgage scheme that ultimately resulted in pervasive foreclosures on overvalued property and the further diminution of whatever property values remained in and around the Subdivisions.

195. Each of the Plaintiffs obtained their mortgages through one of the Lender Defendants and each Plaintiff had virtually the identical experience with the loan process. RAN, SEWM, TRM, Metro, Premier, Providence and Coastal each had agents, acting as unlicensed mortgage brokers, soliciting, collecting and transferring the Plaintiffs' income and credit history to the Lender Defendants. RAN, SEWM, TRM, Metro, Premier, Providence and Coastal, in concert with the Lender Defendants, selected only those appraisers who would provide an appraisal for the property at the value necessary for the Defendants to obtain the fraudulent gain on the sale.

196. The Lender Defendants participated in these inflated sales, knowing that the purchasers were grossly overpaying for the property, as part of a plan to grab the market share of loans made to or for the Subdivisions. The Lender Defendants relaxed or ignored federal and state underwriting guidelines, and USPAP, for the purpose of originating loans and generating

profits.  The Lender Defendants authorized its loan officers, agents, servants and employees, to participate in open houses, sales meetings and promotions relating to the Subdivisions.  Each of the loan originators for each respective Lender Defendants acted within the scope of their employment.  Therefore, the Lender Defendants are responsible for their respective employees' actions in originating and funding fraudulent loans.

197.    Additionally, the Lender Defendants were on site for many of the sales pitches made to these Plaintiffs and therefore knew that many, if not most, of the investment purchasers, including the Plaintiffs herein, were relying upon the fraudulent misrepresentations made by RAN, SEWM, TRM, Metro, Premier and Coastal about a return on investment resulting from the resale of property in just weeks or months after the sale to Plaintiffs.

198.    The Lender Defendants never notified or warned any purchaser, particularly Plaintiffs, that they were paying 2-3 times the price of identical lots located in the identical Subdivision compared to sales made directly through RAN that had occurred within days or weeks of each other.   Instead, the Lender Defendants continued to write loans based on information that was never verified for properties that were overvalued due to the fraudulently inflated appraisals.

199.    At all times relevant hereto, the Lender Defendants knew that TRM, Metro, Premier and Coastal had no lots in their inventory and that TRM, Metro, Premier, Providence and Coastal would be required to conduct a concurrent sale of both its acquisition purchase from RAN or Maryville and its out-sale to the Plaintiffs at the same settlement company, usually with deeds being recorded on the same day and within minutes of each other for each transaction.

200.    At all times relevant hereto, the Lender Defendants knew that TRM, Metro, Premier, Providence and Coastal would use part of the sales proceeds from each lot to pay for its

simultaneous acquisition of that lot from RAN or Maryville, along with closing costs. Therefore, the Lender Defendants not only knew that the Sub-Developers were "flipping" the properties, the Lender Defendants knew the price TRM, Metro, Premier and Coastal paid and the mark-up of the prices to the Plaintiffs. Moreover, the Lender Defendants had actual knowledge of the flip transactions because an essential part of underwriting is a review of the title history on each property sold, which invariably demonstrated that the sellers in these transactions were selling property that they did not yet own. At all times relevant hereto, all Defendants, including TRM, Metro, Premier, Providence and Coastal, the Defendant Appraisers and the Lender Defendants were acting for a common purpose and in concert with each other, directly and indirectly, regarding the promotion and sale of the lots in the Subdivisions to Plaintiffs.

201. The Lender Defendants also knew, or had reason to know, that the appraisal process for those persons purchasing property directly from RAN was flawed by the use of inappropriate comparables, inflated prices and bogus "cash" sales.

202. The Lender Defendants' product in this case was a "retail" mortgage, as opposed to a wholesale or correspondent mortgage) and therefore the Lender Defendants owed a duty to the Plaintiffs to work only with licensed mortgage brokers, to communicate *directly* with Plaintiffs as the borrowers, to create true and accurate closing documents including the HUD-1 and obtaining its own appraisal for the property rather than relying upon appraisals tendered to them by others. See 31 USC 5311 et seq. The Lender Defendants had a duty to disclose to Plaintiffs that they were manipulating appraisals; that they were violating USPAP; and that they were really acting on behalf of the Allen Entities, not Plaintiffs.

203.    At all times relevant hereto, the Lender Defendants, their agents, servants and employees were acting within the scope of their employment for the purpose of promoting the origination of mortgage financing for the sale of lots in the Subdivisions.

204.    The Lender Defendants each distributed loan application packages, either directly, through their employees, servants and agents, or through the unlicensed brokers each Lender Defendant employed in which the criteria for the approval of a loan was described.  Each of the Lender Defendants indicated that an appraisal was required to be performed.  Each of the loan packages dictated to the Plaintiffs which appraiser would be utilized by the Lender Defendant. While the loan packages ostensibly allowed the Plaintiffs to select their own appraiser, the Lender Defendants knew that each Plaintiff resided out-of-state and therefore the likelihood that any Plaintiff would have the local knowledge to select their own appraiser was remote.

205.    The Lender Defendants also owed the duty to Plaintiffs, the vast majority of whom were not sophisticated real estate purchasers, to follow standard underwriting guidelines as dictated to the Lenders by Federal Regulations and USPAP.  The Lenders' duty included, but was not limited to:

        a.    determining whether the purchaser, not the seller, was making the down payment;

        b.    determining whether the purchaser, not the seller, was making the interest payments on the mortgage;

        c.    determining why the appraisal process utilized for these Plaintiffs used only comparables within the Subdivision, contrary to the Uniform Standards of Professional Appraisal Practice;

        d.    conducting underwriting on *all* transactions within the Subdivisions instead of ignoring the RAN and Maryville sales for fair market value;

e.       determining why they uniformly employed a loan program for stated income and a 5-year ARM instead of other conventional financing;

f.       determining whether or not the mortgage brokers were properly licensed;

g.       confirming a 10% deposit was actually made by the Plaintiffs;

h.       confirming the source of funds for each transaction; and

i.       verifying that the seller held clear title and was therefore legally able to sell the property to the purchaser.

206.    No Plaintiff, through the exercise of reasonable diligence, could have discovered the conspiracy between the Lender Defendants and the other Defendants, or that USPAP guidelines were being ignored, or that the appraisals were being wrongfully manipulated.

**P.    Plaintiffs In The Flip Transactions Receive The Offer to Invest**

207.    Of the Plaintiffs who purchased from one of the Defendants herein, the offer was generally the same.  Indeed, even the purchase agreement forms were identical in virtually all cases whether the Seller was TRM, Metro, Premier, Providence or Coastal. TRM, Metro, Premier, Providence and Coastal, with the direct assistance and cooperation of the other Defendants, offered to pay:

a.       all closing and settlement costs;

b.       a 10% "down payment" (which TRM, Metro, Premier, Providence and Coastal referred to as "immediate equity"); and

c.       the first two years of mortgage interest payments.

d.       The 10% down payment credit was typically shown on the settlement statement as "earnest money deposit" as if the buyer had deposited that amount with the seller at the time of contract. The two years of mortgage interest payments were not shown on the settlement statement at all, and were disbursed to the buyers after closing.

-54-

208. It is uncontested that each of the Developer Defendants acted, simultaneously, as mortgage brokers in connection with all Plaintiffs' applications for financing.

209. It is uncontested that most of the Developer Defendants' employees were not properly licensed mortgage brokers, nor did most of these alleged "brokers" act for or on behalf of a specific Lender Defendant. Instead, each of the "brokers" acted for and on behalf of all other Defendants in order to effectuate the scheme.

210. Even before the Plaintiffs could bid on certain property, the price and, consequently, the ill gotten gain, had already been determined by all Defendants. Although it was not known to the Plaintiffs, all other Defendants knew that the properties alleged to be under "option" or in the inventory of the Developer Defendants had either been previously sold for substantially less than the parcel contiguous to it; or was "acquired" by the Developer Defendant at a price that was substantially less than the Developer Defendant charged Plaintiffs.

211. In addition to its overall marketing scheme, TRM, Metro, Premier, Coastal, Providence and Southeastern engaged in numerous other misrepresentations including telling potential purchasers that lots were selling out very soon; telling purchasers that they would be able to resell their lots easily for a profit; each Developer Defendant represented that it owned the lots that it offered for sale to purchasers and each held itself out as acting as the purchasers' real estate agent. None of these representations were true.

212. Prior to the actual purchase of the property, each Plaintiff received a loan package from the ostensible mortgage representative representing one of the Developer Defendants. Contained within that mortgage application package was a disclaimer, substantially identical in form regardless of which Lender Defendant was involved, indicating that the loan was contingent on a successful appraisal. Each Plaintiff was therefore led to believe that their lender

would perform an appraisal, and that the transaction was conditioned upon the return of a successful appraisal.

213.    The Plaintiffs believed, or were told, that the Lender Defendants would obtain appraisals from independent appraisers for purposes of determining the appraised value of the property and its corresponding suitability as collateral for their loans. As a practical matter, it was the Lender Defendants who determined the fair market value of the lot to be purchased.

214.    Moreover, without the appraised value coming in exactly as required, the Plaintiffs were incapable of closing the transaction; unless the property was determined to be sufficient collateral for the loan, no Plaintiff could have qualified to acquire the property. Virtually every Plaintiff had an economic profile that would not permit an additional, substantial loan payment and therefore the entire transaction was wholly dependent upon the property appraisal; a fact that each and every party to the transaction knew and understood.

215.    Each of the Lender Defendants has publicly decried the allegation that it made under-collateralized loans in connection with these Subdivisions.  Each Lender Defendant has claimed that they, too, are a victim in this fraud perpetrated by all Defendants. However, the recently discovered emails between the Lender Defendants and the Allen Entities not only makes the scheme plausible, the evidence demonstrates that the Lender Defendants' actively participated in the fraudulent practices.

Q.    **The Plaintiffs Purchasing Directly From The Developer Were Defrauded**

216.    The manipulation of prices, beginning in Cannonsgate and continuing to Summerhouse, started with RAN.  Phase I of Cannonsgate was purportedly open to the public, but no such public advertisement or offering was ever made.   Instead, Phase I was sold

exclusively to "insiders" of the Allen Enterprise who bought under the expressed promise by Watts and other SEWM personell that the purchase of a lot today would guarantee a return on investment within weeks or months. For example, Douglas Draffin was working for the waste water treatment contractor installing a waste water facility at Cannonsgate. He was given an offer to become part of phase I only because of his employment status. He purchased his lot in Cannonsgate only because Watts told him that RAN was going to list the property "next door" the following day for much more than Draffin was purchasing his for. While Draffin was at the development, in October 2005, Watts announced that not only had Phase I sold out, but that Phase II had sold out as well. Neither of these representations were true.

217. The average sale price for Cannonsgate Phase I, prior to December 8, 2005 was $452,000. After the Bednar and Therrell transactions, however, prices went up substantially as a direct consequence of the bogus "cash" sales and the influence of the Allen Enterprise on the appraisers who willingly defied their obligation to make unbiased appraisals of the property.

218. No single Plaintiff in this action would have possibly been able to maintain the debt schedule on the loan application AND the debt service associated with these transactions without a resale, as promised, within 6 to 18 months. The Lender Defendants ignored most underwriting standards and instead relied upon stated (not verified) income statements. In reality, the single most important determination regarding who would or would not qualify for a "loan" was the appraisal.

219. Upon information and belief, not a single Plaintiff who applied for financing with any of the Lender Defendants was denied. Each and every Plaintiff, regardless of their economic circumstances, was approved because the Lender Defendants had designed the entire loan

program around making sure each loan applicant would qualify and that the necessary appraisal came in as predicted.

220.    It is uncontested that State and Federal underwriting regulations require that appraisals be accurate and independent. See 12 U.S.C. §§ 3331 *et seq.*  USPAP is incorporated into federal, North Carolina and South Carolina law. See 12 C.F.R. § 34.44; N.C. GEN. STAT. § 93E-1-12 (a) (9); S.C. Code Ann. § 40-60-10, et seq. The Lender Defendants' own loan documents support this proposition because all Plaintiffs received loan applications that stated that appraisals were to be done in connection with the loan and were a critical component of the Lender Defendants' underwriting process.

221.    A common thread in all of these transactions was that the Plaintiffs could not close on the purchase unless the appraisal demonstrated that the collateral - the lot - was valuable enough to adequately cover the loan in the event of default.  These Plaintiffs relied upon the Lender Defendants' representations that a thorough underwriting process was ongoing and that reputable, independent appraisers were being utilized as required by law, to determine the fair market value of the property.  That process was corrupted early in the lending process by the Allen Enterprise through the members of the conspiracy including but not limited to Bednar, Therrell, Watts and Woolard.

222.    The reliance of the Plaintiffs on their various Lender Defendants is significant. Charged with the knowledge and experience of a nationally chartered bank, and with the training, education and experience of decades of mortgage lending, the Lender Defendants were the *sine qua non* to the sale of the property.  Once the Lender Defendants said the property appraised for the inflated purchase price, the Plaintiffs were able to close on the sale of the lots at prices that were predicated entirely on the "value" assigned in the rigged appraisal.

223.    What the Plaintiffs did not know, and what the Defendants failed to disclose, was that the Plaintiffs were being defrauded through the use of appraisals that were rigged to return a particular value for the lot in contravention of USPAP.

224.    Upon information and belief, appraisers who failed to support the purchase price, *i.e.*, who were not "in line" with the fraudulent scheme, were discharged.  Specifically, Plaintiffs know of at least two examples where an appraiser was discharged by one or more of the Lender Defendants because their appraisal reflected the true market value of the lot and not the inflated prices set by the Developer Defendants.

225.    Indeed, the appraisers who refused to participate in the fraudulent scheme were never again requested to perform appraisals of any lots in any of the Subdivisions because the sale price to the Plaintiffs had already been determined by the Developer Defendants.

226.    One appraiser who participated in the scheme was Alan Sullivan ("Sullivan"). His appraisals of Summerhouse lots not only contain language that appears as if written by the marketing department at Summerhouse, but his valuation, based on improper comparables is patently absurd.  Sullivan notes in one of his appraisals:

> This is a new very high end subdivision with limited sales in Onslow County to compare it to.  Lots are ranging in price from $119,000 to $899,000. The best sales and most accurate closed sales would be from the last subdivision (Cannonsgate) that this developer just completed which is located near Swansboro, NC.  This is almost identical to Summerhouse except Summerhouse will have many more amenities such as a 10,000 sq. ft. clubhouse, tennis courts, walking trails, nature parks, playground parks for kids, five man made lakes with Spicer Lake being one mile long and approximately 900 feet wide.

227.    What is striking about Sullivan's appraisal is that Cannonsgate is 32 miles away from Summerhouse and in a different county. Cannonsgate had always been touted as the 'higher end' of the two developments but to read Sullivan's phony appraisal, a buyer would think that Summerhouse was the higher end development.

228.    In further demonstration that the appraisal process was fundamentally flawed, Sullivan notes in one of his appraisals dated March 6, 2007, that the comparables used to reach his opinion "were given to this appraiser by the developer."

## V.  LIABILITY OF RAN UNDER ILSA

229.    For purposes of this action, RAN is a "developer" as that term is defined under ILSA because RAN knew that neither TRM, Metro, Premier nor Coastal was ever the ultimate purchaser of the properties they sold; instead, each fraudulently "owned" title to the property for a matter of seconds before the property was flipped to the ultimate purchaser. Pursuant to its duties as the developer, RAN was required to distribute Property Reports to those Plaintiffs who received their property from a Sub-Developer.

230.    Moreover, RAN was TRM's, Metro's, Premier's and/or Coastal's "agent", as that term is defined under ILSA, because, among other reasons, it actively participated in the marketing and sales of the Subdivision lots to Plaintiffs.

## VI.  LIABILITY OF MARYVILLE UNDER ILSA

231.    Upon information and belief, the blanket mortgage on the purchase of Craven's Grant required Maryville to sell a certain percentage of the lots in the Subdivision prior to obtaining partial releases from the underlying mortgage.  Maryville was incentivized by its financing arrangement to sell lots as quickly as it could. The fraudulent scheme operated to Maryville's advantage. Maryville acted in concert with the other Defendants to effectuate the scheme.

232.    For purposes of this action, Maryville is a "developer" as that term is defined under ILSA because Maryville knew that neither TRM, Metro, Premier nor Coastal was the ultimate purchaser of the properties they sold; instead, each fraudulently "owned" title to the

property for a matter of seconds before the property was flipped to the ultimate purchaser. Pursuant to its duties as the developer, Maryville was required to distribute Property Reports to Plaintiffs herein.

233.    Moreover, Maryville was TRM's, Metro's, Premier's and/or Coastal's "agent", as that term is defined under ILSA, because it actively participated in the marketing and sales of the Subdivision lots to Plaintiffs.

## VII.  LIABILITY OF SOUTHEASTERN UNDER ILSA

234.    Southeastern designed and planned the marketing strategy, materials, electronic media and related promotional material to Plaintiffs.  Notably, Southeastern, through its agents and servants, promoted the likely resale of the lots, affirming the illegitimate profit scheme designed by TRM, Metro, Premier and Coastal for the purpose of causing the Plaintiffs to rely upon those representations.

235.    At all times relevant hereto, Southeastern had actual knowledge of TRM, Metro, Premier and Coastal's fraudulent scheme and actively assisted in the creation and distribution of the false and fraudulent marketing materials.

236.    By operation of law, Southeastern owed a duty to distribute Property Reports to the Plaintiffs because Southeastern was acting as TRM's, Metro's, Premier's and Coastal's agent.

## VIII.  RICO ALLEGATIONS

### 1)    Enterprise Allegations

237.    Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact who constitute a RICO enterprise that is referred to herein as the "Allen Enterprise": RAN, RAN I, Southeastern, SLS. Cannonsgate Investments LLC, MLA, Santa Rosa, Randy Allen, Gary Allen, Mrs. Allen, Bednar, Therrell, Watts, Wilson,

Woolard, Poole, the Lender Defendants, the Sub-Developers and the Appraiser Defendants (collectively referred to as the "Allen Enterprise Defendants") and others whose identification will become known through discovery.

238. The Allen Enterprise is an organization that operated in furtherance of a common purpose beginning in or around 2002 and continues to this day.

239. While the Allen Enterprise Defendants participated in and are members and part of the Allen Enterprise, they also have an existence separate and apart from the Allen Enterprise.

240. In order to successfully and convincingly market properties at artificially inflated prices and induce purchasers to pay and finance purchases at the inflated prices, the Allen Enterprise Defendants needed an organization and system that enabled them to effectively establish an aura of bona fide values and demand. The Allen Enterprise provides that organization and system. While each of the Allen Enterprise Defendants would typically act independently, the participation of Lender Defendants and Appraiser Defendants allows the Allen Enterprise to function effectively and eliminates the checks and balances that would normally protect purchasers and conceals the true and common objective of the Defendants.

241. The Allen Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants have engaged.

242. The Allen Enterprise Defendants control and operate the Allen Enterprise through a variety of means, including, but not limited to, the following:

      a.     investing funds to secure and preliminarily develop the Subdivisions for sale as individual lots to purchasers such as Plaintiffs;

      b.     developing and utilizing a common marketing plan designed to mislead prospective buyers regarding the high value and high demand for the lots within the Subdivisions;

c.    agreeing to orchestrate, finance and/or participate in filing inaccurate and false title records;

d.    using inappropriate and/or false appraisals and other tactics to create comparable sales data that appears to support the false representations of high value and high demand;

e.    agreeing to facilitate the approval and funding of loans at amounts that do not correspond to the true value of the properties, but rather are based upon inflated/manipulated values;

f.    agreeing to manipulate the values of the properties; and

g.    retaining unjust profits from the sale of real estate and services resulting from the conduct of the Allen Enterprise.

**2)    Predicate Acts:  Bribery, Mail and Wire Fraud: 18 U.S.C. §§ 201, 1341, 1343**

243.    Section 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 201 (relating to providing money to public officials with the intent to induce official action), 18 U.S.C. § 1341 (relating to mail fraud), and 18 U.S.C. § 1343 (relating to wire fraud). As set forth above, Allen Enterprise Defendants have engaged, and continue to engage, in conduct violating each of these laws to effectuate their scheme. *See* paragraphs, including but not limited to, 147-150.

244.    For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, Defendants Gary Allen, Randy Allen, RAN, SEWM, Wilson and Poole in violation of 18 U.S.C. § 201, through their agents, servants and employees, offered and paid valuable consideration in the form of cash, kickbacks, campaign contributions, undisclosed rebates,

vacation trips and other things of value to government employees and those holding public office as more fully described in paragraphs, including but not limited to, 132-146.

245.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false or fraudulent pretenses, representations or promises, Defendants Gary Allen, Randy Allen, Wilson, Watts, Woolard, SEWM, RAN, SLS, the Lender Defendants and the Appraiser Defendants, in violation of 18 U.S.C. § 1341, caused matter and things to be delivered by the Postal Service or by private or commercial interstate carriers. These acts were done intentionally and knowingly with the specific intent to advance Allen Enterprise's scheme, or with knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

246.     The Allen Enterprise Defendants carried out their scheme in different states and could not have done so unless they used the Postal Service or private or commercial interstate carriers.

247.     For the purpose of executing and/or attempting to execute the above described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants Gary Allen, Randy Allen, Wilson, Watts, Woolard, SEWM, RAN, SLS,the Lender Defendants and the Appraiser Defendants,, in violation of 18 U.S.C. 1343, transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs and signals. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme, or with knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

248.     The Allen Enterprise Defendants knew or should have foreseen that the use of the mails and wires would be required to carry out the scheme.

249.     The matter and things sent by Defendants via the Postal Service, private or commercial carrier, wire or other interstate media include, inter alia:

        a.      Correspondence and marketing materials that intentionally misled Plaintiffs regarding the interest in and availability of property within each development;

        b.      Correspondence and marketing materials that intentionally misrepresented the value of the properties in the Developments that were the subject of the scheme;

        c.      Correspondence, contracts, agreements, appraisal reports, financing documents, powers of attorney and other materials used to further Defendants' fraudulent scheme and buttress misrepresentations regarding the amount of interest in and value of properties within each development; and

        d.      Correspondence and e-mails among the Defendants regarding the scheme and conduct to be undertaken in furtherance of the scheme.

### 3)      Pattern of Racketeering Activity

250.     The Allen Enterprise Defendants did knowingly, willfully and unlawfully engage in a "pattern of racketeering activity" within the meaning of 18 U.S.C § 1961 (5) by committing at least two acts of racketeering activity, *i.e.* indictable violations of 18 U.S.C. §§ 201, 1341 and 1343 as described above.  In fact, each of the Defendants has committed multiple acts of racketeering activity.  Each act was related, had a similar purpose, involved the same or similar participants and means of commission, had similar results and impacted similar victims, including Plaintiffs.

251.     The multiple acts of racketeering activity, which Defendants committed and/or conspired to or aided and abetted in the commission of, were related to each other and amount to

and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961 (5).

### 4)     Defendants' Conduct Caused Direct Injury to Plaintiffs

252.    Plaintiffs have suffered direct and proximate harm as a result of Defendants' misrepresentations, omissions, deceptions and acts of concealment.

253.    As a result of the Defendants' fraudulent scheme, Defendants have obtained money and property that belong to Plaintiffs and the Plaintiffs have been injured in their business and/or property by the Defendants' overt acts of bribery, mail and wire fraud.

## IX.  INTERSTATE LAND SALES FULL DISCLOSURE ACT

254.    ILSA was passed in 1968 to prevent fraud in the sale of investment real estate. For purposes of this action, certain definitions are important:

a.      "common promotional plan" means a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease; where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan. 15 U.S.C. § 1701 (4);

b.      "developer" means any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision. 15 U.S.C. § 1701 (5);

c.      "agent" means any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services. 15 U.S.C. § 1701 (6);

d.    "interstate commerce" means trade or commerce among the several States or between any foreign country and any State. 15 U.S.C. § 1701 (8); and

e.    "purchaser" means an actual or prospective purchaser or lessee of any lot in a subdivision. 15 U.S.C. § 1701 (10).

255.    ILSA prohibits specific activities in the sale or lease of property, and applies to *any "Developer" or "Agent"*, and covers their direct or indirect activity. 15 U.S.C. § 1703. Among the protections offered purchasers of real property, ILSA states that a Developer may not sell or lease lots in a subdivision, unless:

a.    A Statement of Record is in effect; and

b.    Each purchaser is given a printed Property Report prior to signing any contract or agreement for sale or lease, all in accordance with the provisions of ILSA and the regulations. 15 U.S.C. § 1703 (a) (1).

256.    In addition to the Statement of Record and Property Report requirements, ILSA has an anti-fraud section that covers a variety of prohibited acts. 15 U.S.C. § 1703 (a) (2).  For example, section (a) (2) makes it unlawful for any Developer or Agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails:

a.    to employ any device, scheme, or artifice to defraud;

b.    to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;

c.    to engage in any transaction, practice, or course of business that operates or would operate as a fraud or deceit upon a purchaser; or

d.    to represent that roads, sewers, water, gas, or electric service, or recreational amenities will be provided or completed by the developer without stipulating in the contract of sale or lease that such services or amenities will be provided or completed.

## COUNT 1
## VIOLATION OF 18 U.S.C. § 1962 (C) - RICO (ALL DEFENDANTS)

257.    Plaintiffs re-allege and incorporate all prior paragraphs.

258.    As set forth above, all Defendants have violated 18 U.S.C § 1962 (c) by conducting, or participating directly or indirectly in the conduct or the affairs of the Allen Enterprise through a pattern of racketeering activity, including indictable acts under 18 U.S.C. §§ 201, 1341 and 1343.

259.    As a direct and proximate result of Defendants' misrepresentations, manipulations, fraud and omissions as herein alleged, Plaintiffs have been injured in their business and/or property by the predicate acts that make up the Defendants' pattern of racketeering activity through the Allen Enterprise.

## COUNT 2
## VIOLATION OF 18 U.S.C. § 1962 (D) - RICO (ALL DEFENDANTS)

260.    Plaintiffs re-allege and incorporate all prior paragraphs.

261.    In violation of 18 U.S.C § 1962 (d), Defendants have, as set forth above, conspired to violate 18 U.S.C § 1962 (c). The conspiracy began at least as early as 2002 and continues to this day.  The object of the conspiracy was/is to sell real estate in the Subdivisions owned or controlled by the Allen Enterprise at inflated prices resulting in increased profits for each Defendant.

262.    As set forth above, each of the Defendants knowingly, willfully, and unlawfully agreed and combined to conduct or participate, directly or indirectly, in the conduct of the affairs and activities of the Allen Enterprise.

263. Defendants have committed numerous overt acts of racketeering activity or other wrongful activity in furtherance of such conspiracy.

264. The purpose of the acts that caused injury to Plaintiffs was to advance the overall objective of the conspiracy and the harm to Plaintiffs was a reasonably foreseeable consequence of Defendants' scheme.

265. As a direct and proximate result of Defendants' misrepresentations, manipulations, fraud and omissions as alleged herein, Plaintiffs have been injured in their business or property by the Defendants' conspiracy and by the predicate acts which make up the Defendants' pattern of racketeering activity.

**COUNT 3**
**DAMAGES PURSUANT TO THE**
**INTERSTATE LAND SALES FULL DISCLOSURE ACT**
**(DEVELOPER DEFENDANTS AND LENDER DEFENDANTS)**

266. Plaintiffs re-allege and incorporate all prior paragraphs.

267. 15 U.S.C. § 1703 (a) (2) (A) makes it unlawful, with regard to sales subject to its requirements, for a Developer to employ any device, scheme, or artifice to defraud.

268. 15 U.S.C. § 1703 (a) (2) (B) makes it unlawful, with regard to sales subject to its requirements, for a Developer to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements not misleading, with respect to any information pertinent to the lot or Subdivision.

269. 15 U.S.C. § 1703 (a) (2) (C) makes it unlawful, with regard to sales subject to its requirements, for a developer to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon purchaser.

270. Under 15 U.S.C. § 1701 (5), a "Developer" includes any person who, directly or indirectly, sells or offers to sell or advertises for sale any lots in a subdivision.

271.    Under 15 U.S.C. § 1701 (6), an "Agent" includes any person who represents, or acts for or on behalf of, a developer in selling or offering to sell lots in a subdivision.

272.    Cannonsgate, Summerhouse and Craven's Grant are "subdivisions" as defined by 15 U.S.C. § 1701 (3).

273.    All Developer Defendants are statutory "developers" and/or "agents" for the Subdivisions under ILSA.

274.    An underlying purpose of ILSA is to ensure that a buyer, prior to purchasing certain kinds of real estate, is informed of facts that will enable him or her to make an informed decision about purchasing the property.

275.    Pursuant to 15 U.S.C. § 1703 (a) (1) (B), all purchasers of property that are not exempt under ISLA are to receive a Property Report that complies with 15 U.S.C. § 1707 prior to the signing of a contract for the purchase of property.

276.    None of the lots in the Subdivisions are exempt under ILSA.

277.    None of the Plaintiffs receving their property in a flip transaction received a Property Report as required by 15 U.S.C. § 1703 (a) (1) (B).

278.    ILSA required the Developer Defendants to provide Property Reports to all of the Plaintiffs.

279.    24 C.F.R. § 1715.20 makes it unlawful for any Developer or Agent, directly or indirectly, to engage in unlawful sales practices, including (i) giving a contract to a purchaser or asking the purchaser to sign anything before delivery of the Property Report; (ii) making any representation that could result in the denial of a right to revoke the transaction; and (iii) representing that the lot has good investment potential.

280.    24 C.F.R. § 1715.25 makes it unlawful for any Developer or Agent to engage in misleading sales practices, including representing that a resale or repurchase program is in place, unless an ongoing program is in existence.

281.    The Developer and Sub-Developer Defendants violated the provisions of 24 C.F.R. §§ 1715.20 and 1715.25 by giving contracts to some Plaintiffs or asking Plaintiffs to sign documents before delivery of a Property Report representing to Plaintiffs that properties sold to them in the Subdivision(s) had good investment potential, and representing to some Plaintiffs that a resale or repurchase program was in place, when no ongoing resale or repurchase program existed.

282.    As a result of Developer Defendants' violations of ILSA and the U.S. Department of Housing and Urban Development ("HUD") regulations issued thereunder, the Plaintiffs were damaged in the amount of (i) the difference between the purchase prices of the properties purchased in the Subdivisions and the true fair market value; (ii) the carrying costs of the properties purchased in the Subdivisions, including, but not limited to, mortgage fees, HOA fees and property taxes, (iii) the costs of defending foreclosure actions with respect to the lots, and (iv) in some cases, damage to Plaintiff's credit scores impairing their ability to obtain mortgage financing in the future

**COUNT 4**
**NORTH CAROLINA UNFAIR AND**
**DECEPTIVE TRADE PRACTICES ACT (ALL DEFENDANTS)**

283.    Plaintiffs re-allege and incorporate all prior paragraphs.

284.    The purpose of the NCUDTPA is "[t]o declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and the consuming public within [North Carolina] to the end that good faith and fair dealings between buyers and

sellers at all level[s] of commerce be had in [North Carolina]." *Bhatti v. Buckland*, 328 N.C. 240, 400 S.E.2d 440 (1991). The statute is designed to protect consumers from various unfair business activities.

285. The elements of the NCUDTPA include: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) that proximately causes injury to the Plaintiffs.

286. The N.C. UDTPA defines commerce as any business activity. N.C. GEN. STAT. § 75-1.1 (b).

287. All Defendants engaged in unfair and deceptive acts by, among other things:

      a.      Soliciting and obtaining false appraisals;

      b.      Failing to use truthful and accurate HUD-1 Settlement Statements;

      c.      Failing to use a contract that accurately described the terms of the contract between the Seller and each Plaintiff, especially the financial incentives offered;

      d.      Steering purchasers to select lenders who used corrupt appraisers and who knowingly participated in the overall scheme;

      e.      Falsifying some of Plaintiffs' loan applications;

      f.      Using deceptive and dishonest testimonials;

      g.      Using deceptive and false advertising;

      h.      Intentionally misrepresenting the values of properties in Summerhouse and Cannonsgate to Plaintiffs who purchased property in North Carolina;

      i.      Failing to inform Plaintiffs who purchased property in North Carolina of the actual value of the property in Summerhouse and Cannonsgate;

      j.      Failing to inform Plaintiffs of the amount the Developer Defendants actually paid for lots in Summerhouse and Cannonsgate;

k.     Misrepresenting that the Developer Defendants received a discounted price by purchasing lots in bulk in Summerhouse and Cannonsgate;

l.     Representing to Plaintiffs who purchased property in North Carolina that the lots in Summerhouse and Cannonsgate were good investment properties;

m.     Operating as mortgage brokers without a license in violation of the North Carolina Mortgage Lending Act. N.C. GEN. STAT. § 53-243.01 et seq.;

n.     Operating as real estate agents without a license in violation of the laws of North Carolina;

o.     Operating as title insurance agents without a license in violation of the laws of North Carolina;

p.     In some cases, failing to provide Plaintiffs who purchased property in North Carolina with a Property Report as required prior to the Plaintiffs signing the contract for the purchase of property; and

q.     In some cases, failing to provide Plaintiffs who purchased property in North Carolina with notice of their right of revocation in the contract for the purchase of properties in Summerhouse and Cannonsgate.

288.     The sale of lots in Summerhouse and Cannonsgate to the Plaintiffs directly affects commerce.

289.     Plaintiffs were harmed as a direct result of the actions of all Defendants and were damaged in the amount of (i) the difference between the purchase prices of the lots purchased in Summerhouse and Cannonsgate and the true fair market value; (ii) and the carrying costs of the lots, including but not limited to, mortgage fees, HOA fees, and property taxes.

290.     The actions by all Defendants resulting in the sale of lots in Summerhouse and Cannonsgate were willful.

291. Plaintiffs who purchased lots in either Summerhouse or Cannonsgate are entitled to treble damages and their attorney fees pursuant to NCUDTPA § 75-16.

**COUNT 5**
**NORTH CAROLINA UNFAIR AND DECEPTIVE**
**TRADE PRACTICES ACT (LENDER DEFENDANTS)**

292. Plaintiffs re-allege and incorporate all prior paragraphs.

293. The purpose of the NCUDTPA is "[t]o declare, and to provide civil legal means to maintain, ethical standards of dealings between persons engaged in business and the consuming public within [North Carolina] to the end that good faith and fair dealings between buyers and sellers at all level[s] of commerce be had in [North Carolina]." *Bhatti v. Buckland*, 328 N.C. 240, 400 S.E.2d 440 (1991). The statute is designed to protect consumers from various unfair business activities.

294. The elements of the NCUDTPA include: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) that proximately causes injury to the Plaintiffs.

295. The NCUDTPA defines commerce as any business activity. N.C. GEN. STAT. § 75-1.1 (b).

296. The Lender Defendants engaged in unfair and deceptive acts by:

    a. Intentionally misrepresenting the values of properties in Summerhouse and Cannonsgate to the Plaintiffs;

    b. Failing to inform the Plaintiffs of the actual value of the lots in Summerhouse and Cannonsgate;

    c. Failing to inform the Plaintiffs what each Plaintiff's seller (*i.e.* one of the Developer Defendants) paid for lots in Summerhouse and Cannonsgate;

    d. Deferring to a Developer Defendant's selection of the appraiser of the lots instead of selecting an appraiser who would act in accordance with the USPAP. (also include a

paragraph that says "Requiring appraisers selected to provide appraisals appraise lots at values specified by agents of the Lender Defendants in contravention of USPAP"?)

> e. Failing to communicate at all with Plaintiffs/borrowers; and

> f. Engaging in improper loan origination, underwriting, and closing procedures.

297. The mortgage loans made by the Lender Defendants to Plaintiffs directly affects commerce.

298. The Plaintiffs who purchased in either Summerhouse or Cannonsgate were harmed as a direct result of Lender Defendants' unfair and deceptive acts as described herein.

299. The Plaintiffs who purchased in either Summerhouse or Cannonsgate were damaged in the amount of (i) the difference between the purchase prices of the lots purchased in Summerhouse and Cannonsgate and the true fair market value; (ii) the carrying costs of the lots purchased in Summerhouse and Cannonsgate, including, but not limited to, mortgage fees, HOA fees, and taxes.

300. The Lender Defendants' actions resulting in the sale of properties in Summerhouse and Cannonsgate to the Plaintiffs were willful.

301. The Plaintiffs who purchased lots in either Summerhouse or Cannonsgate are entitled to an order awarding treble damages and their attorney fees pursuant to N.C. GEN. STAT. § 75-16 against Lender Defendants.

## COUNT 6
## SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (MARYVILLE, SLS, WATTS, WOOLARD, GARY ALLEN, RANDY ALLEN, LENDER DEFENDANTS, APPRAISER DEFENDANTS)

302. Plaintiffs re-allege and incorporate all prior paragraphs.

303. The purpose of the SCUTPA is to protect consumers from various unfair business activities.

304. The elements of the SCUTPA include: (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) that proximately causes injury to the Plaintiffs.

305. The SCUTPA defines commerce as the advertising, offering for sale, sale or distribution of any services and any property … and shall include any trade or commerce directly or indirectly affecting the people of [South Carolina]. S.C. CODE ANN. § 39-5-10.

306. All Defendants engaged in unfair and deceptive acts by, among other things:

      a.     Soliciting and obtaining false appraisals;

      b.     Failing to use truthful and accurate HUD-1 Settlement Statements;

      c.     Failing to use a contract that accurately described the terms of the contract between Sellers and each Plaintiff, especially the financial incentives offered;

      d.     Steering purchasers to select lenders who used corrupt appraisers and who knowingly participated in the overall scheme;

      e.     Falsifying some of Plaintiffs' loan applications;

      f.     Using deceptive and dishonest testimonials;

      g.     Using deceptive and false advertising;

      h.     Intentionally misrepresenting the values of properties in Craven's Grant to Plaintiffs who purchased property in South Carolina;

      i.     Failing to inform Plaintiffs who purchased property in South Carolina of the actual value of the property in Craven's Grant;

      j.     Failing to inform Plaintiffs of the amount the Developer Defendants actually paid for property in Craven's Grant;

k.      Misrepresenting that the Developer Defendants received a discounted price by purchasing lots in bulk in Craven's Grant;

l.      Representing to Plaintiffs who purchased property in South Carolina that the lots in Craven's Grant were good investment properties;

m.      Operating as mortgage brokers without a license in violation of the South Carolina Mortgage Lending Act;

n.      Operating as real estate agents without a license in violation of the laws of South Carolina;

o.      Operating as title insurance agents without a license in violation of the laws of South Carolina;

p.      Failing to provide Plaintiffs who purchased property in South Carolina with a Property Report prior to the Plaintiffs signing the contract for the purchase of property; and

q.      Failing to provide Plaintiffs who purchased property in South Carolina with notice of their right of revocation in the contract for the purchase of properties in Craven's Grant pursuant to ILSA.

307.    The sale of lots in Craven's Grant to the Plaintiffs directly affects commerce.

308.    Plaintiffs were harmed as a direct result of the actions of all Defendants and were damaged in the amount of (i) the difference between the purchase prices of the lots purchased in Craven's Grant and the true fair market value; (ii) and the carrying costs of the lots, including, but not limited to, mortgage fees, HOA fees, and taxes.

309.    The actions by all Defendants resulting in the sale of lots in Craven's Grant were willful.

310.    Plaintiffs who purchased in Craven's Grant are entitled to treble damages and their attorney fees pursuant to S.C. CODE ANN. § 39-5-140 (a).

<u>**COUNT 7**</u>
**SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT (LENDER DEFENDANTS)**

311.    Plaintiffs re-allege and incorporate all prior paragraphs.

312.    The purpose of the SCUTPA is to protect consumers from various unfair business activities.

313.    The elements of the SCUTPA include:  (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) that proximately causes injury to the Plaintiffs.

314.    The SCUTPA defines commerce as the advertising, offering for sale, sale or distribution of any services and any property … and shall include any trade or commerce directly or indirectly affecting the people of [South Carolina]. S.C. CODE ANN. § 39-5-10.

315.    The Lender Defendants engaged in unfair and deceptive acts by:

a.    Intentionally misrepresenting the values of lots in Craven's Grant to the Plaintiffs;

b.    Failing to inform the Plaintiffs of the actual value of the lots in Craven's Grant;

c.    Failing to inform the Plaintiffs what each Plaintiff's seller (*i.e.* one of the Developer Defendants) paid for lots in Craven's Grant;

d.    Deferring to a Developer Defendant's selection of the appraiser of the lots instead of selecting an appraiser who would act in accordance with the USPAP;

e.    Directing appraisers to appraise lots at specified values in contravention of USPAP

f.    Failing to communicate at all with Plaintiffs/borrowers; and

g.  Engaging in improper loan origination, underwriting, and closing procedures.

316.  The mortgage loans made by the Lender Defendants to Plaintiffs directly affects commerce.

317.  The Plaintiffs who purchased lots in Craven's Grant were harmed as a direct result of Lender Defendants' unfair and deceptive acts as described herein.

318.  The Plaintiffs who purchased in Craven's Grant were damaged in the amount of (i) the difference between the purchase prices of the lots purchased in Craven's Grant and the true fair market value; (ii) the carrying costs of the lots purchased in Craven's Grant, including, but not limited to, mortgage fees, HOA fees, and taxes.

319.  The Lender Defendants actions resulting in the sale of lots in Craven's Grant to the Plaintiffs were willful.

320.  The Plaintiffs who purchased lots in Craven's Grant are entitled to an order awarding treble damages and their attorney fees pursuant to the S.C. CODE ANN. § 39-5-140 against Lender Defendants.

## COUNT 8
## COMMON LAW FRAUD (ALL DEFENDANTS)

321.  Plaintiffs re-allege and incorporate all prior paragraphs.

322.  The Defendants falsely represented and concealed material facts relative to the purchase of the lots.

323.  The Defendants reasonably calculated that the aforementioned misrepresentations would deceive Plaintiffs, because had Plaintiffs been aware of these misrepresentations, they would not have invested in the fraudulent scheme.

324.    The Defendants made the aforementioned misrepresentations with the intent of deceiving Plaintiffs.

325.    Plaintiffs were deceived by the aforementioned misrepresentations made by the Defendants.

326.    Plaintiffs could not discover the truth about the condition and true nature of their investments by exercise of reasonable due diligence.

327.    Plaintiffs were induced to forego additional investigation of their investments by the Defendants' misrepresentations.

328.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' fraudulent misrepresentations relative to the purchase of the lots in question, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 9
## FRAUD IN THE INDUCEMENT (ALL DEFENDANTS)

329.    Plaintiffs re-allege and incorporate all prior paragraphs.

330.    The Defendants made false representations and/or concealed material facts that they had a duty to disclose, relative to the purchase of lots in North Carolina and South Carolina and thereafter failed to do so.

331.    These false representations are directly related to each of the transactions that collectively comprise the purchase of the lots in question.

332.    The Defendants made these representations intending to deceive Plaintiffs.

333.    Plaintiffs reasonably relied on the representations and acted upon them by entering into the purchase of said lots.

334.     Due to the existence of the fraud, the inducement by the Defendants, and Plaintiffs' detrimental reliance, the purchase of lots and the corresponding mortgage used to finance said purchases lacks mutuality, and is therefore unenforceable against Plaintiffs.

335.     Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' fraudulent inducements relative to the Investment Contract in question, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 10
## CONSTRUCTIVE FRAUD (ALL DEFENDANTS)

336.     Plaintiffs re-allege and incorporate all prior paragraphs.

337.     The Defendants created a relationship of trust and confidence with Plaintiffs relative to Plaintiffs' participation in the purchase of lots in North Carolina and South Carolina.

338.     The Defendants took advantage of the position of trust in order to benefit themselves, by proffering a number of misrepresentations intended to deceive Plaintiffs with respect to the purchase of said lots.

339.     Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' constructively fraudulent misrepresentations relative to the purchase of the lots in question, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 11
## NEGLIGENT MISREPRESENTATION (ALL DEFENDANTS)

340.     Plaintiffs re-allege and incorporate all prior paragraphs.

341.     Plaintiffs justifiably relied on the Defendants' misrepresentations, relative to the purchase of the lots in question.

342.    The materials and information assembled to proffer the negligent misrepresentations to Plaintiffs were prepared without reasonable care.

343.    As Plaintiffs' fiduciaries, the Defendants owed the Plaintiffs a duty of care.

344.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' negligent misrepresentations relative to the purchase of the lots in question, and have suffered financial loss in an amount to be determined by the trier of fact.

**COUNT 12**
**CIVIL CONSPIRACY (ALL DEFENDANTS)**

345.    Plaintiffs re-allege and incorporate all prior paragraphs.

346.    Plaintiffs further incorporate herein the allegations contained in the preceding paragraph, which are made part and parcel of this Cause of Action for Civil Conspiracy.

347.    The Defendants agreed and schemed between themselves to deceive Plaintiffs, relative to the condition and nature of Plaintiffs' investments in the purchase of the lots in question.

348.    The purpose of the agreement and scheme between the Defendants to deceive Plaintiffs, relative to the condition and nature of Plaintiffs' purchase of lots, was to further the unlawful ends of committing fraud upon the Plaintiffs, and breaching their fiduciary duties toward said Plaintiffs.

349.    The Defendants conceived of and implemented a common scheme or plan to engage in the conduct complained of herein, in furtherance of an agreement to injure Plaintiffs relative to the condition and nature of Plaintiffs' purchase of the lots in question.

350.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged, as a result of the Defendants' conspiracy to defraud Plaintiffs and to breach their

fiduciary duties owed the Plaintiffs, relative to the purchase of the lots in question, and have suffered financial loss in an amount to be determined by the trier of fact.

## COUNT 13
## NEGLIGENCE (LENDER DEFENDANTS)

351. Plaintiffs re-allege and incorporate all prior paragraphs.

352. The Lender Defendants owed certain duties to their respective borrowers to act in a reasonable manner and to provide services with the degree of skill, care, knowledge and expertise as any other similarly situated mortgage lender.

353. The Lender Defendants breached those duties to the Plaintiffs herein, by way of example and not limitation:

      a. Intentionally misrepresenting the values of the lots in question to the Plaintiffs;

      b. Failing to inform the Plaintiffs of the actual value of the lots in question;

      c. Failing to inform the Plaintiffs what each Plaintiff's seller (*i.e.* one of the Developer Defendants) paid for lots;

      d. Deferring to a Developer Defendant's selection of the appraiser of the lots instead of selecting an appraiser who would act in accordance with the USPAP;

      e. Failing to communicate at all with Plaintiffs/borrowers; and

      f. Engaging in improper loan origination, underwriting, and closing procedures.

354. As a direct and proximate result of the negligence of the Lender Defendants, the Plaintiffs have suffered damages.

## COUNT 14
## FRAUDULENT TRANSFER
## (GARY ALLEN, RANDY ALLEN, MRS. ALLEN, RAN, MLA

355.    Plaintiffs re-allege and incorporate all prior paragraphs.

356.    This count is brought as a pendant, state law cause of action as a result of newly discovered evidence of a violation of the Uniform Fraudulent Transfer Act, N.C. GEN. STAT. § 39-23.1 et seq.

357.    Sometime in 2004, Mrs. Allen formed two companies, both named MLA Income Properties.  One was registered in North Carolina and the other in Nevada.  MLA Income Properties (hereinafter, collectively and in the singular, "MLA") is, upon information and belief, a shell corporation whose existence is solely designed to achieve the fraudulent results complained of herein.

358.    On January 18, 2007 (recorded January 23, 2007), MLA purportedly bought 6 parcels (lots 75, 304, 397, 421, 432, 457) in two separate transactions, in Cannonsgate, for a total of $868,000.00.  Exhibits 41 and 42. These sales are notable for four reasons.  First, MLA paid demonstrably less than the 'going rate' for like kind parcels at the time of the purchase.  Second, MLA paid cash for the property which itself is remarkable since there is no evidence anywhere that Plaintiffs could find to show that MLA had any business activity that would result in any spendable assets, much less nearly $1M in cash. Third, these sales occurred at a time when RAN claimed that Cannonsgate had already "sold out." Fourth, RAN sold lot 432 to MLA on January 23, 2007.  But RAN did not have title to lot 432 at the time of sale, nor has it acquired title since January 23, 2007.   Lot 432 was sold to Plaintiffs Andrew Jacobson and James Walsh on December 1, 2005 for $500,000.  Jacobson and Walsh still own title to that property. Exhibit 43.

359.    Sixty days after acquiring lot 397 from RAN, on March 27, 2007, MLA sold that same lot to Steven Reichenbach for $300,000.00. Exhibit 44. Lot 397 is rather unremarkable in

comparison to the other lots acquired by MLA. For example, lots 421 and 457 are "comparable" to other properties that sold 13 months earlier for $699,000 each. Mrs. Allen did not pay market rates, or anything close to it, but instead acquired the property at a huge discount and then recovered back 33% of the total "purchase price" for all six lots with just one resale to Mr. Reichenbach.

360.    In the middle of 2008, prices in Cannonsgate began to plummet and continued on a downward spiral as news of the fraud perpetrated by the Defendants became well known. As the foreclosures increased in Cannonsgate, the prices for property dropped by an average of 80-85%. By December 30, 2010, property that once sold for more than $500,000.00 in Cannonsgate was being sold for less than $100,000.00.

361.    In early 2010, Carteret County began the revaluation of real property for county ad valorem tax purposes in accordance with N.C. GEN. STAT. §105-286. N.C. GEN. STAT. §105-283 requires that all property, real and personal, be valued at its true value in money as of the effective revaluation date. "True value" means "market value".

362.    "Market value is further defined as "the price estimated in terms of money at which the property would change hands between a willing and financially able buyer and a willing seller, neither being under any compulsion to buy or sell and both have reasonable knowledge of all the uses to which the property is adapted and for which it is capable of being used"

363.    In a recent bulletin to taxpayers in Carteret County, the County Tax Administrator described the method for how the revaluation is done. In order to arrive at the value of land (without buildings), Carteret County uses the "sales method" to determine the assessed value of the land. In so doing, Carteret County looks "at recent comparable sales of similar classes of

land to establish the assessed tax value." "Our staff appraisers do a great deal of research within the year prior to the effective date of the revaluation to determine current … land values" Exhibit 45.

364.    On December 30, 2010 MLA purportedly "sold" four of the five remaining properties, excluding the property it didn't own in the first place – lot 432 -  back to RAN for an astounding $1,430,000.  Exhibit 46.

365.    Carteret County revalued the property "sold" by MLA (Mrs. Allen) to RA North (Gary Allen) as well. The revaluation for the four lots acquired by RA North is disturbing considering that RA North was buying back its own property for $1,430,000.

Lot 75 has a market value of  $27,904.00  Exhibit 47

Lot 304 has a market value of $91,256.00  Exhibit 48

Lot 421 has a market value of $29,143.00  Exhibit 49

Lot 457 has a market value of $100,589.00  Exhibit 50

366.    The total market value for these four lots is $248,892.00.  Thus, RA North paid $1,181,108.00 too much, at least according to every other buyer dealing in an arm's length transaction within Cannonsgate.

367.    In North Carolina, a fraudulent transfer occurs when:

§ 39-23.4. Transfers fraudulent as to present and future creditors
A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) With intent to hinder, delay, or defraud any creditor of the debtor…

368.    Plaintiffs submit that the "sale" of property from MLA/ Mrs. Allen to RAN/Gary Allen is a patently fraudulent transaction in violation of § 39-23.4.  Plaintiffs seek the return or

sequestration of these fraudulently transferred funds and such other relief afforded defrauded creditors under such statutes.

**WHEREFORE**, Plaintiffs pray for a judgment:

A.      Awarding Plaintiffs compensatory damages, punitive damages, attorney's fees, and all litigation costs;

B.      Awarding Plaintiffs pre-judgment and post-judgment interest as provided by law; and

C.      Awarding such other and further relief as may be just and proper.

**Respectfully submitted,**

**GIARMARCO, MULLINS & HORTON, P.C.**

By: /s/ David A. Binkley
DAVID A. BINKLEY (P31643)
Attorney for Plaintiffs
101 W. Big Beaver Road, Tenth Floor, Columbia Center
Troy, MI 48084-5280
248.457.7000

**THE O'CONNOR LAW FIRM, PLLC**

By /s/ John S. O'Connor
JOHN S. O'CONNOR (#37832)
309 S. Laurel Avenue, Ste. 100
Charlotte, NC 28207
704.919.1885
John@joconnorlaw.com
State Bar No. 37832
LR 83.1 Counsel


Dated:  February 16, 2011

## <u>JURY DEMAND</u>

Plaintiffs demanded a trial by jury on all issues that may be so tried.


**Respectfully submitted,**

**GIARMARCO, MULLINS & HORTON, P.C.**

By: /s/ David A. Binkley
DAVID A. BINKLEY (P31643)
Attorney for Plaintiffs
101 W. Big Beaver Road
Tenth Floor, Columbia Center
Troy, MI 48084-5280
248.457.7000


**THE O'CONNOR LAW FIRM, PLLC**

By /s/ John S. O'Connor
JOHN S. O'CONNOR (#37832)
309 S. Laurel Avenue, Ste. 100
Charlotte, NC 28207
704.919.1885
John@joconnorlaw.com
State Bar No. 37832
LR 83.1 Counsel

Dated: February 16, 2011